## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Criminal No.  07-131 (JR)** |
| | : | |
| **V.** | : | |
| | : | |
| | : | |
| **JAMES BECTON et al.,** | : | |
| **Defendants.** | : | |

## GOVERNMENT'S NOTICE OF INTRINSIC EVIDENCE

The Government hereby gives notice of the type of evidence that it intends to offer at trial that is "intrinsic" to the case.  Defendant Becton filed a "Request for Notice of Government's Intention to Use Rule 404(b) Evidence at Trial" (Doc. #107).  By this response, the Government provides notice to Becton and the other defendants that there exist numerous uncharged acts (both criminal and non-criminal) that the Government will offer against defendants James Becton, Willie Best, Keith Sampler, Rubin Butler, Deborah Jones, Tyrone Washington, Johnny Hodge, and Christopher Becton.   All of the evidence (with the exception of  certain prior convictions discussed in section III, infra) falls outside the requirements of Rule 404(b) as it is direct evidence of the conspiracy.  As set forth more fully below, the Government respectfully submits that Rule 404(b) is an inappropriate analytical framework to evaluate evidence that is intrinsic or direct evidence of the conspiracy.

## I.  FACTUAL BACKGROUND REGARDING THE INVESTIGATION

Beginning in or about May 2001, the Federal Bureau of Investigation (FBI) began investigating drug trafficking in and around the 4200 and 4300 blocks of 4th Street, S.E., in Washington, D.C.  This particular stretch of Fourth Street, Southeast, featured a series of

apartment parking lots, or "courts", on the west side of the street beginning south of Chesapeake Street, S.E, with another parking lot, referred to as "the Pit," across Fourth Street from the "courts." The Fourth Street "courts" and the "pit" were open air crack cocaine markets. Two brothers, James Lamont Becton and Willie Best, defendants herein, were identified as two of the principal drug sellers operating in these markets.

In 2001 and 2002, FBI agents engaged in a series of investigative operations in the Fourth Street area. For example, on July 27, 2001, agents executed a search warrant at 4219 4th Street, S.E., Apartment 7, a known stash location for James Becton. There, agents recovered approximately 67 grams of crack cocaine as well as a ceramic plate and razor blade with crack cocaine residue. And beginning in approximately May 2001 and lasting through 2002, confidential informants working under the direction of FBI agents were able to engage in a series of controlled purchases of drugs from numerous sellers in the Fourth Street area. On seven such occasions, the last of which occurred on June 19, 2002, confidential informants made controlled purchases from James Becton and/or Willie Best. Every one of the controlled purchases from Best and Becton was captured on audiotape.

Although the Fourth Street investigation was progressing and focusing on the principal leaders, James Becton and Willie Best, staffing and resource changes at the FBI had the effect of slowing the pace of law enforcement's work in the area. As the investigation slowed, James Becton, Willie Best, and their co-conspirators strengthened their grip on the 4th Street open-air crack cocaine market. The evidence at trial will show that several factors contributed to the organization's rise and success: the closely confined geographic market that was the 4200/4300 blocks of Fourth Street, S.E., with a lay-out and topography ideally suited for narcotics

trafficking; an extensive network of Best-Becton family members and supporters able to assist

with drug sales and provide safe harbor; plentiful supply of kilogram-quantities of cocaine from

multiple sources; the highly addictive nature of the end product, crack cocaine;  ready access to

firearms; and a demonstrated willingness on behalf of the organization's members, particularly

James Becton, to protect the organization's "turf" through violence and threat of violence.

The FBI's investigation resumed in earnest in 2004.  That year, while James Becton was

serving an approximately two-year prison sentence, business flourished for Willie Best.  On

January 14, 2004, U.S. Park Police recovered over 50 grams of crack cocaine and over $2000 in

cash from a car that Willie Best and Deborah Jones had parked at the FDR Memorial in

Washington, D.C.  On October 14, 2004, the North Carolina State Highway Patrol recovered four

kilograms of cocaine stashed in a car being driven by one of Best's couriers, which was riding on

Interstate 95 in tandem with a second vehicle in which Best and Jones were traveling.  Paperwork

bearing Best's name was recovered from the same car as the four kilograms of cocaine.

Beginning on September 27, 2005, following the afore-mentioned events and the

cultivation of several cooperating witnesses, law enforcement initiated the first in a series of

several periods of court-authorized interception on cellular telephones utilized by the

conspiracy's leadership.  Agents first received authorization to wiretap the cellular telephone of

Fred Mercer, a trusted associate of James Becton and Willie Best and a lieutenant in the

organization.   From that wiretap, agents were able to identify a cellular telephone number for

James Becton and obtained authorization to intercept Becton's telephone from October 27, 2005,

to November 25, 2005.  On the final day of interception, November 25, 2005, Becton's phone

went dead.  In an effort to continue the investigation and develop new numbers for both Becton

and Best, agents obtained court authorization to intercept Mercer's phone for a second thirty-day period.  The second Fred Mercer wiretap ran from December 16, 2005, to January 14, 2006.

The second wiretap of Fred Mercer's phone yielded a telephone number for Willie Best, and agents conducted two periods of court-authorized interception on Best's phone from January 27, 2006, to February 25, 2006, and from February 26, 2006, to March 27, 2006.  Following the Best wiretaps, agents obtained court-authorization to intercept three additional cellular telephones being utilized by James Becton.  Interception of those three telephone lines began on April 4 and 5, 2006, and ended May 25, 2006.  Collectively, the wiretapped phone calls provided significant evidence of the conspiracy and the organization's day-to-day operations.  On innumerable calls, James Becton, Willie Best, and other co-conspirators can be heard discussing (albeit in loosely coded language) the acquisition of drugs; supply, demand, and pricing of drugs; cooking powder cocaine into crack; the possession and transfer of firearms; and the collection of money from street-level sellers in the conspiracy.

Additional evidence about the narcotics conspiracy comes from a series of search warrants executed on May 22, 2006, and a second series of search warrants executed on May 23, 2007, the date of the case "take down."  From these search warrants, agents recovered a number of firearms and a significant quantity of crack cocaine and powder cocaine from the homes of James Becton and Fred Mercer.  In addition, agents recovered numerous items of drug paraphernalia, including several digital scales and other items coated with crack cocaine residue, from persons and locations associated with James Becton, Willie Best, Chris Becton, and Deborah Jones.

Collectively, the Government's investigation in this case has marshaled evidence about

the historical roots of the Becton-Best drug conspiracy, going back as early as 1992. The proof at trial will include evidence from fellow co-conspirators who trafficked drugs with or for the defendants; from witnesses and victims of violent offenses perpetrated in furtherance of the conspiracy; from law enforcement officers whose contacts with the defendants over the years provide illustrative proof of the existence of an ongoing narcotics conspiracy; from the wiretaps on the Mercer, Becton, and Best phones; and from the numerous search warrants resulting in the recovery of narcotics, weapons, cash, drug paraphernalia, and evidence of association between and among the defendants. In this filing, we endeavor to provide general notice of the sorts of proof we anticipate at trial.[1]

## II. EVIDENCE OF THE CONSPIRACY

A.    Testimony about Drug Sales and Acts of Violence

Most of the Government's cooperators are individuals who participated in and have direct knowledge of the day-to-day drug trafficking activities, the violent offenses endemic to that drug trade, and other criminal and non-criminal activities committed in furtherance of the conspiracy by themselves and other members of the conspiracy.

Specifically, in regards to James Becton, these witnesses will describe how James Becton and his brother, Willie Best, came to be the primary suppliers of crack cocaine in the 4200/4300 blocks of Fourth Street, S.E. Witnesses will describe James Becton's historical and familial relationships to his co-conspirators. They will describe how James Becton and his brother,

---

[1]  It would not be feasible to provide a thorough and complete overview of the testimony that will be elicited from Government witnesses. Accordingly, this memorandum provides the highlights of the types of areas of knowledge of the conspiracy that will be the subject of testimony. It is by no means exhaustive, and could not hope to be, without committing the entire trial to paper before a single witness is sworn.

Willie Best, learned the drug trade and engaged in narcotics trafficking in various places around Southeast Washington, from Congress Park, in the early 1990s, to the intersection of T and 13th Streets, S.E., to the 4600 block of Livingston Road, S.E. and the 2800 block of Robinson Place, S.E., and eventually to Fourth Street, S.E., where business thrived. The witnesses will testify about their basis of knowledge, including the nature, frequency and duration of meetings with Becton for nefarious purposes including the transfer of narcotics, instances in which James Becton, Willie Best, and other co-conspirators cooked crack cocaine from powder cocaine in their presence, how Becton was himself supplied, Becton's tactics for evading police detection (such as using telephones subscribed to in names other than his own; speaking in coded language over the telephone; and "dumping" phones), and how Becton concealed handguns in his vehicles. Witnesses will describe James Becton's business practices, including his acquisition of kilogram quantities of cocaine from suppliers on consignment, his willingness to rely on his reputation for violence to obtain favorable terms, his fondness for selling hand-to-hand at the street level notwithstanding his stature in the organization, and his other practices and habits including but not limited to his frequent weapon possession.

Some specific examples of prior drug activity engaged in by James Becton will include an incident on April 2, 1992, in the vicinity of 13th and Congress Streets, S.E., in which an undercover police officer observed Becton showing a female a quantity of crack rocks in his hand. The undercover officer asked Becton to purchase some of the crack; Becton refused and ran; and following a footchase he was arrested and police recovered approximately 25 crack rocks. Yet another example will be how, in the Spring of 2006, Becton and a co-conspirator were able to acquire four kilograms of cocaine at a reduced price because the kilograms had a

gasoline taste to them.  A third but by no means final example will be an incident that occurred on June 17, 2003, when officers with the Metropolitan Police Department observed James Becton and a co-conspirator inside 4331 4th Street, S.E., one of the apartment buildings from which street-level sellers operated in the "2nd Court."  As the officers approached, Becton and the co-conspirator ran up the stairs and into a third party's apartment, #6.  As the co-conspirator ran to the apartment's bathroom, Becton tried to close the apartment door on the officers.  The officers forced the door open, and from the bathroom recovered approximately 9.6 grams of crack in the toilet bowl with the toilet water running.  In the area where Becton was standing when he was trying to close the door, officers recovered an additional 2.5 grams of crack. Officers also recovered $959 from Becton's pocket.[2]

Witnesses also will describe how James Becton's willingness to resort to violence over the years allowed him to exert control on the market for illegal narcotics trafficking in the Fourth Street area, and how Becton and his co-conspirators used violence and threats of violence to preserve their business from threats posed by rival drug dealers.  Becton routinely threatened and assaulted would-be drug customers who had the temerity to try to purchase drugs in the Fourth Street area from someone outside the conspiracy.  Cooperating witnesses will describe how Becton sicked his pitbull, "Rampage," on would-be buyers, and how, for example, in November 2006, Becton pistol-whipped a drug customer who wanted to purchase drugs from a seller other

---

[2]  Becton was charged in this case in D.C. Superior Court case no. F3557-03.  D.C. Superior Court Judge Thomas J. Motley found that defendant Becton had standing to lodge a Fourth Amendment challenge to the recovery of the evidence and the Court granted the defense motion to suppress after the prosecution rested its presentation in the motion hearing without calling to the stand the apartment's leaseholder, for whom a material witness warrant had issued. The United States intends to call the leaseholder at trial and stands ready to re-litigate the suppression issue if necessary.

than Becton himself.  Furthermore, testimony from a cooperating witness will describe how, in

Spring 2000, Becton recruited co-defendants Keith Sampler, Tyrone Washington, the

cooperating witness, and a fourth co-conspirator to rob a rival drug dealer in Southeast

Washington at gunpoint.  Several witnesses will describe how, on November 8, 2002, Becton

opened fire on a man in the "2nd Court" because he believed the man was selling crack cocaine

that did not come from Becton or Best.  And there will be testimony that, in 2003, Becton

described to cooperating witnesses how he (Becton), while trying to acquire drugs on behalf of

the conspiracy, got into a shoot-out with a drug supplier in California.

The testimony about the other leader of the organization, Becton's brother, Willie Best,

will be similar.  Cooperating witnesses will describe how Best learned the business aspect of

narcotics trafficking, and how he graduated from trafficking in ounce-quantities of crack cocaine

to kilogram quantities of powder cocaine, which he then cooked into crack.  On March 1, 1999,

Best was arrested in the 4600 block of Livingston Road, S.E., with a quantity of crack and

marijuana.  By the year 2000, if not earlier, Best was acquiring kilograms of cocaine; and on

October 14, 2004, Best was arrested in North Carolina along with Deborah Jones and a third co-

conspirator when the North Carolina Highway Patrol interdicted a load of four kilograms of

cocaine from a car that Best was traveling in tandem with, north on Interstate 95.  Cooperating

witness testimony will also describe how, in the weeks before the October 14, 2004, arrest, Best

was regularly engaging in cocaine transactions, including one such transaction at Deborah Jones'

apartment on Minnesota Avenue, N.E., in Washington, D.C. on or about October 7, 2004.  From

the court-authorized wiretap, the evidence shows that Best personally made deliveries and

collected money from street-level sellers, and that Best maintained quantities of drugs at his

residences and even around his children.[3]

The evidence will also show that Best was very careful in his narcotics trafficking. Best was extremely careful on the phone to never mention narcotics by name; he would often hug associates, checking for body wires; and he often paid for criminal defense attorneys to represent co-conspirators with legal troubles, in an effort to minimize the likelihood that a co-conspirator would cooperate with the government.

Best, like his brother, frequently carried weapons and was also willing to use force or violence in furtherance of the narcotics conspiracy. Cooperating witnesses will testify about how Best trafficked in firearms. Indeed, when he was arrested in this case several months after the coordinated case take-down, on December 7, 2007, in Henrico County, Virginia, police recovered three weapons, including an assault rifle, from the stolen car that Best was driving. Years earlier, in July 1994, Best shot a co-conspirator, Russell Ramseur, because he believed Ramseur had stolen a 62-gram quantity of crack cocaine from him. Best did so in the presence of other conspirators, including Tyrone Washington, in one of geographic centers of the conspiracy as it existed then, namely, Livingston Road, S.E.. Best pled guilty to an Assault with a Dangerous Weapon charge in that case (D.C. Superior Court case no. F9750-94). More recently, in approximately 2000, Willie Best believed that one of his co-conspirators, a man named Damian Campbell, was "hot," that is, that Campbell was surreptitiously working with law enforcement. Willie Best and James Becton recruited another co-conspirator, who will testify at trial, to murder Campbell. In consideration for the hit, Best promised the co-conspirator payment

---

[3] In an intercepted phone call from January 13, 2006, Best describes to a co-conspirator how his son, Gavin, was taken to the hospital after he took a bite of a chunk of crack cocaine.

of 125 grams of crack cocaine and $3,000 in cash. Best ultimately called the hit off at the last minute.

The evidence at trial will also include cooperating witness testimony and testimony from police officers regarding specific prior instances of drug trafficking and weapons possession by the other defendants. A cooperating witness will testify that he first met Tyrone Washington and Chris Becton when the two of them came running inside an apartment together after the witness heard the sound of gunfire outside. The anticipated testimony that the narcotics conspiracy operated in the 4600 block of Livingston Road before moving to the 4200/4300 blocks of Fourth Street, S.E., will be substantiated by testimony from law enforcement officers who separately arrested Tyrone Washington and Christopher Becton in the 4600 block of Livingston Road, S.E., and charged them each with possession with intent to distribute marijuana on January 23, 1999, and September 2, 1998, respectively.[4] Similarly, anticipated testimony that these two defendants – step-brothers with one another – both sold drugs provided to them by Willie Best and James Becton in the 4300 block of Halley Road will be substantiated by proof of their previous drug arrests in that block. Police arrested Tyrone Washington in the 4300 block of Halley Terrace following a "buy-bust" operation on October 1, 2003, and police arrested Chris Becton in the same block following a similar operation on August 17, 2004. Anticipated testimony about firearms possession will be substantiated by the testimony of law enforcement officers who twice arrested Chris Becton with firearms, on February 23, 1999, and again on August 29, 2003.

Cooperating witnesses will also describe how all the defendants, including Chris Becton,

---

[4] Tyrone Washington pled guilty to charges stemming from the January 23, 1999, arrest in D.C. Superior Court case no. M841-99. The case against Chris Becton was "no-papered."

Tyrone Washington, Keith Sampler, Rubin Butler, and Johnny Hodge regularly sold drugs hand-to-hand, in furtherance of the conspiracy, in and around the apartment buildings in the 4200 and 4300 blocks of Fourth Street, S.E.  Police officers were witness to at least some of these transactions.  By way of example, an undercover police officer purchased quantities of crack cocaine five separate times from Johnny Hodge, between the months of May and July 2005.  These buys were captured on audio and videotape, and all take place in the vicinity of Fourth and Sixth Streets, S.E.  On another occasion, on March 31, 2007, metropolitan police officers saw Tyrone Washington engaging in hand-to-hand drug transactions in the vicinity of 4217 Fourth Street, S.E.  When police executed a search warrant at that apartment building a week later, on April 6, 2007, officers found Washington in an apartment along with a digital scale and ziplock bags used to package crack cocaine.

Cooperating witnesses also will describe violent acts committed by these other co-conspirators in furtherance of the drug trafficking.  For example, there will be eyewitness testimony that in approximately 2006, in the "2nd Court," Johnny Hodge fired shots at a co-conspirator in an apparent argument about drug sales.  Hodge's bullets missed their mark but struck a nearby vehicle.  Eyewitness testimony about that shooting and photographs of the bullet-ridden vehicle will be introduced at trial.  Similarly, there will be testimony that Chris Becton was considered a "soldier" in the organization.  He was so notorious for robbing – something he could do on Fourth Street with impunity because of his last name – that co-conspirators called him "Omar," a reference to a character on the HBO series "The Wire."  In November 2006, Chris Becton robbed a drug dealer in the "2nd Court" because that dealer was selling crack cocaine that did not come from the Becton-Best organization.

B.    Evidence Establishing Association or Prior Relationship

In addition to the foregoing evidence, law enforcement agents seized numerous group photographs which helped to establish the involvement and identity of members of the crew. Usually taken at various night clubs, but some taken in other venues, such as Willie Best's wedding, these photos depict members of the organization in various combinations and poses. These photographs form a significant core of evidence which shows the close associations and relationships that the defendants had with one another.

Cooperating witnesses will testify about how these co-conspirators spent their time together when they were not selling drugs. Whether by socializing at clubs, apartments, or dog fights, such evidence will be introduced to establish the associations and relationships.

In addition, hours of surveillance by agents depicts the comings, goings, and meetings of, and relationships among, the various co-conspirators in the 4200 and 4300 block of Fourth Street. For example, surveillance on July 26, 2005, shows Rubin Butler, also known as "Buster", standing in front of the apartment buildings on Fourth Street for long periods of time with other co-conspirators, conduct consistent with Butler's role as a Becton "flunkie" and street-level seller in the organization. Video surveillance on January 25, 2006, shows James Becton, Keith Sampler, and Rubin Butler arriving in the "2nd Court," entering an apartment building lobby, and then departing a short time later. Following their arrival, the video surveillance shows a steady stream of drug users quickly walking into the building and leaving moments later.[5] Surveillance on April 17, 2007, shows James Becton arriving on Fourth Street in his BMW and meeting with

---

[5] There will also be testimony that Keith Sampler went by the nicknames "Son" and "Son-Son" because he acted like a younger version of (and the son of) James Becton.

co-conspirator Chris Becton.  Both these co-conspirators, like all the other charged defendants, lived not on Fourth Street, S.E., but in Maryland.  Evidence such as this is useful to demonstrate during the relationships, kinships, and day-to-day operating procedures in this narcotics conspiracy.  These are just some examples of the kind of anecdotal evidence that the Government will offer to show that an association in fact existed and these defendants were part of it.

      C.      <u>Uncharged Conduct in Furtherance of the Conspiracy</u>

The Government will offer some evidence that does not pertain to a specific charge in the indictment but that nevertheless directly shows conduct committed in furtherance of the conspiracy. A sampling of the type of evidence that falls within this category includes the hours of surveillance, some of which is summarized above, as well as intercepted  phone conversations, possession of large sums of cash and documentary evidence showing no legitimate source of income.

The phone calls intercepted through the various wire taps have been provided to the defense.  A sampling of the intercepted calls reveals that co-conspirators used veiled phrases the further the drug conspiracy, including phrases such as "waiting for that stuff to dry" (waiting for recently cooked crack cocaine to dry); "getting a bird and putting it to sleep" (acquiring a kilogram of cocaine and cooking it into crack); "the Reggie Miller joint" (a 31-gram quantity of crack cocaine, named for the NBA player's jersey number); "tree" (marijuana); "the Program" (the conspirators' name for the Becton-Best family narcotics organization);  "the gym's open" (meaning that drugs were available) and "two tennis shoes" (a quantity of narcotics) – just to name a few.  Cooperating witnesses will explain that they regularly employed such coded phrases to conceal their discussion of drug trafficking.

Large quantities of U.S. currency also were recovered from various defendants and the possession of such cash is consistent with illegal drug trafficking. For example, police recovered $23,990 from James Becton on April 25, 2001, $6,000 from Willie Best, Chris Becton, and Fred Mercer on March 12, 2003, $959 from James Becton on June 17, 2003, $2,460 from Willie Best on January 14, 2004, $1,022 from Chris Becton on March 24, 2007, $622 from Tyrone Washington on April 6, 2007, and $2,504 from James Becton on May 22, 2007. The drug market is predominately a "cash and carry" trade and the possession of large amounts of currency is consistent with illegal drug trafficking, particularly when there is no other evidence of a legitimate source of income.

The Government has also obtained the tax records, or the lack of the filing thereof and the lack of W-2 forms, for many of the defendants from tax years 1999 through 2005. Such documentary evidence showing that the defendants have not been lawfully employed for significant periods of their adult lives, together with other evidence, is powerful circumstantial evidence proving that they supported themselves through the illegal drug trade. We will make these tax records available to the individual defendants in compliance with the federal laws.

D.     Involvement in Similar Crimes

Many of the defendants have previously been arrested for and, in some instances, convicted of narcotics and weapons offenses. We have endeavored to cite many examples of such prior contacts in this Motion – almost all of them are pled as overt acts in furtherance of the conspiracy – and evidence of all the prior arrests and convictions have been disclosed to the defense in discovery. It is the government's position that all the evidence surrounding these previous arrests and convictions is admissible as intrinsic evidence or in the alternative, under

Rule 404(b).

### III.  THE EVIDENCE OF THE OTHER ACTS IS ADMISSIBLE IN THE GOVERNMENT'S CASE IN CHIEF

The Government will present evidence and testimony about uncharged drug sales and acts of violence, that establishes associations or prior relationships, conduct committed in furtherance of the conspiracy and involvement in similar crimes against specific defendants and submits that such evidence is direct evidence of the conspiracy.  This type of evidence arises out of the same transaction as the charged offense, is inextricably intertwined with the charged offense or is necessary to complete or explain the story of the crime on trial.[6]  Direct evidence of the conspiracy is not Rule 404(b) "other crimes" evidence and consequently a great deal of evidence that the Government will introduce at trial is not subject to the analytical framework of Rule 404(b).[7]

In order to prove the narcotics conspiracy, the Government may  present evidence of the defendants' criminal wrongdoing that may not relate to specifically charged incidents in the indictment, such as a specific overt act.  This evidence  will not be offered under the authority of

---

[6]  The charged offense being the narcotics conspiracy alleged in Count One of the Superseding Indictment, which spanned at least a twelve-year period.

[7]     Rule 404(b) provides the following:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Rule 404(b) although it could be.  Rather, it is independently admissible as direct proof of the

conspiracy with which the defendants are charged.  Evidence of acts which are part of, or

"inextricably intertwined" with, a charged crime is direct proof of that crime and is not subject to

Rule 404(b) analysis.  United States v. Badru, 97 F.3d 1471, 1474-75 (D.C. Cir. 1996); United

States v. Allen, 960 F.2d 1055, 1058 (D.C. Cir. 1992); United States v. Diaz, 878 F.2d 608, 614-

16 & n.2 & 3 (2nd Cir. 1989); United States v. Edelin, 128 F. Supp. 2d 23, 48 (D.D.C. 2001)

("Evidence of other crimes related to the RICO enterprise and drug conspiracy charged does not

come within the definition of Rule 404(b).").

This rule applies with even greater force where, as here, the crime charged is a conspiracy

and the so-called "other crimes" are, in fact, direct evidence of the existence of the conspiracy

and/or the defendants' entry into the conspiracy.  "In cases where the incident offered is a part of

the conspiracy alleged in the indictment, the evidence is admissible under Rule 404(b) because it

is not an 'other' crime.  The evidence is offered as direct evidence of the fact in issue, not as

circumstantial evidence requiring an inference as to the character of the accused."  Badru, 97

F.3d at 1475 (citing Wright & Graham); see also United States v. Thai, 29 F.3d 785, 812-13 (2nd

Cir. 1994) (evidence of uncharged crimes such as robbery, assault and extortion admitted in

RICO trial was not 404(b) evidence; these crimes were independently admissible since they were

in furtherance of the RICO conspiracy); United States v. Escobar-De Jesus, 187 F.3d 148, 168

n.17 (1st Cir. 1999) ("Because we conclude that the Lajas incident was not 404(b) evidence, but

rather was direct evidence of the conspiracy charged, we have no occasion to decide whether [the

witness's] testimony went beyond matters included in the notice required by Rule 404(b)");

United States v. Green, 175 F.3d 822, 831 (10th Cir. 1999); United States v. Garcia Abrego, 141

F.3d 142, 175 (5th Cir. 1998); <u>United States v. Miller</u>, 116 F.3d 641 (2nd Cir. 1997); <u>United States v. Chin</u>, 83 F.3d 83, 87-88 (4th Cir. 1996); <u>United States v. Maceo</u>, 947 F.2d 1191, 1198-99 (5th Cir. 1991);  <u>United States v. Coiro</u>, 922 F.2d 1008 (2nd Cir. 1991);  <u>United States v. Tejada</u>, 886 F.2d 483, 486-87 (1st Cir. 1989); <u>United States v. Angelilli</u>, 660 F.2d 23, 39 (2nd Cir. 1981); <u>United States v. Salazar</u>, 485 F.2d 1272, 1276 (2nd Cir. 1973); <u>McCormick on Evidence</u> § 190 at 800 & n.17.

Moreover, where evidence of the defendants' acts are either inextricably intertwined with a charged conspiracy, or provide evidence of the conspiracy itself, it is admissible without Rule 404(b) analysis, regardless of whether those acts fall outside the period during which the indictment alleges the conspiracy existed.  <u>United States v. Diaz,</u> 878 F.2d at 614-616 & n.2 (crimes, wrongs or acts – that the house was being used as a stash pad – occurring before the alleged inception date of conspiracy were relevant and admissible in drug conspiracy prosecution and did not raise Rule 404(b) question); <u>United States v. Bates</u>, 600 F.2d 505, 509 (5th Cir. 1979) (testimony concerning acts and backgrounds of co-conspirators  – their marijuana importation business and smuggling activities in Mexico –  including evidence of behavior antedating period covered by indictment, was not extraneous evidence of other crimes, but admissible as bearing on the existence and purpose of the conspiracy and the significance of later behavior); <u>United States v. Bermudez</u>, 526 F.2d 89, 95 (2nd Cir. 1975) (upholding admission of traces of narcotics and narcotics-related equipment seized in home six weeks after conspiracy to distribute cocaine ended).

"Rule 404(b) excludes only evidence 'extrinsic' or 'extraneous' to the crimes charged, not evidence that is 'intrinsic' or 'inextricably intertwined.'" <u>United States v. Allen</u>, 960 F.2d

17

1055, 1058 (D.C. Cir.), cert. denied, 506 U.S. 881 (1992). "[Evidence that Allen watched his co-conspirator sell to an undercover officer] was an intrinsic part of the witness' account of the circumstances surrounding the offense for which Allen was indicted (and also was relevant both to Allen's intent to distribute and his knowledge about [his co-conspirator's] drug cache." Id. at 1058; see also United States v. Gartmon, 146 F.3d 1015, 1020 (D.C. Cir. 1998) (evidence that defendant charged with fraud had threatened a coconspirator not "other crimes evidence" but instead "inextricably intertwined" with charged offense); United States v. Garces, 133 F.3d 70, 77 (D.C. Cir. 1998) (holding that evidence that "was part of the story" was not other crimes evidence); United States v. Washington, 12 F.3d 1128, 1134-35 (D.C. Cir. 1994), cert. denied 513 U.S. 828 (1994) ("Moreover, 'Rule 404(b) excludes only evidence 'extrinsic' or 'extraneous' to the crimes charged, not evidence that is 'intrinsic' or 'inextricably intertwined.' The testimony revealing that Early used his cousin's Kaiser Permanente health insurance card to obtain medical treatment was intrinsic to the charged offense because it helped establish his identity as the driver of the Mazda . . ."); Fed. R. Evid. 404(b), Advisory Comm. Note regarding 1991 Amendment ("The amendment does not extend to evidence of acts which are 'intrinsic' to the charged offense [citation omitted].").

United States v. Badru, 97 F.3d 1471 (D.C. Cir. 1996), is particularly instructive on this point.   In Badru, defendants were charged with conspiracy to distribute and possess with the intent to distribute heroin and actual counts of distribution.  Id. at 1473.  At trial, the government introduced evidence to suggest that the defendants' prior trips to Nigeria were undertaken as part of their smuggling operation of heroin into the United States.  Id.  The Court of Appeals held that the evidence was not "other crimes" within the purview of Fed. R. Evid. 404(b); instead, it had

been properly admitted as "intrinsic" other crimes evidence:

> Given the similar modus operandi between the couriers' pervious
> trips to Nigeria and the planning and execution of the trip that
> ended in April 1993 with the seizure of 5,569 grams of heroin from
> the couriers' luggage, a jury reasonably could find that appellants
> conducted the previous trips for the same purpose as the trip that
> ended in April 1993.

Id. at 1475.    Our Court of Appeals has defined intrinsic other crimes by quoting the Eleventh

Circuit:

> "Evidence of criminal activity other than the charged offense is not
> considered extrinsic if it is an uncharged offense which arose out
> of the same transaction or series of transactions as the charged
> offense, if it was inextricably intertwined with the evidence
> regarding the charged offense, or it is necessary to complete the
> story of the crime of trial . . ."

Badru, 97 F.3d at 1474.  But see United States v. Bowie, 232 F.3d 923, 928 (D.C. Cir. 2000)

(remarking that the foregoing formulation of "intrinsic" is not "particularly helpful").

Testimony about uncharged drug activity, weapons possession, and acts of violence tends

to prove the existence, organization and nature of the narcotics conspiracy, and shows a pattern

of narcotics trafficking activity by each defendant.  For instance, in United States v. Diaz, 176

F.3d 52 (2nd Cir. 1999), the Government introduced evidence of prior uncharged crimes and other

bad acts that were committed by the defendants and cooperating witnesses.  This included one

defendant's drug dealing, stockpiling of weapons to protect the (Latin King) gang's drug trade

and his related acts of violence;  another defendant's ordering gang members to assault others

who sold on their block,  another's commission of a robbery and testimony from cooperators of

their own drug dealing and acts of violence on behalf of the gang.  The Court dispensed with

their claim that Rule 404(b) governed admission, finding "an act that is alleged to have been

done in furtherance of the alleged conspiracy . . . is not an "other" act within the meaning of Rule

404(b); rather it is part of the very act charged." Id. at 79.  Moreover, the Court noted that the

trial court could "admit evidence of the prior acts to inform the jury of the background of the

conspiracy charged, in order to help explain how the illegal relationship between participants in

the crime developed, or to explain the mutual trust that existed between coconspirators." Id.

Evidence that establishes associations or prior relationships is also relevant and

admissible because it may be proof of the defendant's knowing participation in the conspiracy

and be inextricably intertwined with the facts on trial.  Such evidence is intrinsic.  See, e.g.

United States v. Johnson, 12 F.3d 827, 831 (8th Cir. 1994) (evidence of the parties' association is

relevant to the existence of the conspiracy and the accused's participation; moreover, given that

the nature of a conspiracy entails secrecy and an agreement, a member's participation in it is

often established by way of inference from surrounding circumstances), abrogated on other

grounds by Bailey v. United States, 516 U.S. 137 (1995); United States v. Robinson, 978 F.2d

1554, 1562-63 (10th Cir. 1992) (gang affiliation evidence, such as the Crips' blue clothing and

gang posed picture, is "associational evidence" which, standing alone could not support a

conviction, but may be directly relevant on the issues of formation, agreement, and purpose of a

conspiracy.  "Gang membership helped to establish an agreement among the subjects, the

purpose of the conspiracy and knowledge on the part of these defendants.")

Finally, there are separate arguments to introduce evidence of individual defendants' prior

narcotic trafficking and weapons convictions, most of which occurred during the conspiracy and

in the geographic vicinity of the conspiracy's operations.  Those prior convictions are as follows:

- James Becton's 1992 conviction for Attempted Possession With Intent
to Distribute Cocaine (D.C. Superior Court case no. F3580-92),

following his April 2, 1992, arrest, and his 1995 conviction for Carrying a Pistol Without a License on January 13, 1995 (D.C. Superior Court case no. F973-95). These convictions are not included as an overt act in the superseding indictment. Becton pled guilty in F3580-92. He was convicted following trial in F973-95, a case in which he also was acquitted for murder.

- Willie Best's 1995 conviction for Assault with a Dangerous Weapon in D.C. Superior Court case no. F9750-94, following his shooting of Russell Ramseur in July 2004. This conviction is not included as an overt act in the superseding indictment. Best pled guilty in this case.

- Chris Becton's convictions for Carrying a Pistol Without a License (CPWL) on October 4, 1994 (Case no. F9776-94), Possession of Cocaine on January 13, 1995 (Case no. F433-95), and Attempted CPWL and Possession of Marijuana on February 24, 1999 (Case no. F1236-99). The latter two of these convictions are included as overt acts in the superseding indictment (overt acts 1 and 4). Becton pled guilty in all three cases.

- Tyrone Washington's convictions for Possession with Intent to Distribute Marijuana on January 23, 1999 (Case no. M841-99) and February 18, 2000 (Case no. F1066-00). These two convictions are included as overt acts in the superseding indictment (overt acts 3 and 6). Washington pled guilty in both cases.

- Johnny Hodge's convictions for three separate acts of Distribution of Cocaine (Case nos. F4259-05 and F4260-05). These convictions stem from the conduct that serves the basis of overt acts 30, 33, and 36-38. Hodge pled guilty in these cases.

- Keith Sampler's convictions for Possession with Intent to Distribute Cocaine, Carrying a Pistol Without a License, Fleeing a Law Enforcement, Destruction of Property, and Assault on a Police Officer, on December 4, 2006 (Case no. 2006 CF2 26987). These convictions are included as Overt Act 131 in the superseding indictment. Sampler pled guilty in this case. In addition, Sampler's guilty pleas in separate juvenile proceedings for narcotics offenses will be introduced by the government. These materials will be shared with the defense but are not listed specifically in this public filing.

The Government submits that the evidence of the foregoing convictions is direct evidence of the conspiracy, and that proof of the convictions is admissible under Rule 803(22). Rule

803(22) states:

> Judgment of previous conviction. Evidence of a final judgment,
> entered after a trial or upon a plea of guilty (but not upon a plea
> of nolo contendere), adjudging a person guilty of a crime
> punishable by death or imprisonment in excess of one year, to
> prove any fact essential to sustain the judgment, but not
> including, when offered by the Government in a criminal
> prosecution for purposes other than impeachment, judgments
> against persons other than the accused. The pendency of an
> appeal may be shown but does not affect admissibility.

With respect to many of the previous convictions, the government is prepared to prove them up

with the transcript of the plea colloquy.[8]  In all instances, the government intends to obtain and

offer the certified conviction to prove the commission of the charged acts.  The portion of Rule

803(22) that relates to impeachment has no bearing on the admissibility of judgments of

conviction of the defendant being offered to prove facts essential to the judgment.

Rule 803(22) clearly supports the admission of the defendants' prior felony convictions in

this case.  Case law demonstrates that in circumstances analogous to the case here (trial of a

narcotics conspiracy)  prior convictions are admissible for purposes other than impeachment.  In

United States v. Burrell, 289 F.3d 220 (2d Cir. 2002) the Second Circuit held that a juvenile plea

allocution and an adult conviction (both for criminal possession of narcotics) were properly

admitted as proof of the overt acts charged in the narcotics conspiracy.  Id. at 224.  The

Government had admitted two prior convictions, including one juvenile plea allocution, which

the defendant challenged under Federal Rule of Evidence 609(d).  The Court characterized the

609(d) argument as "irrelevant," noting that the Government sought to admit the evidence not to

---

[8]  In certain of the cases, plea transcripts are no longer available because D.C. Superior
Court has destroyed the electronic courtroom recording of the plea hearing.

impeach the defendant, but "rather as direct evidence of his participation in the charged conspiracy." Id. As in this case, the Government in Burrell sought to admit evidence of the prior plea allocution and conviction to prove the conspiracy at issue, not as impeachment or other crimes evidence.

Such evidence was admitted under very similar circumstances in a case from the Southern District of New York. In United States v. Ida, 1997 WL 576105 (S.D.N.Y. Sept. 17, 1997), the Government moved into evidence certified records of state court gambling convictions entered by the defendant and four other persons as part of the Government's proof of a racketeering act charging the defendant and others with conducting an illegal gambling business as part of a large conspiracy. Id. at *6. Defense counsel objected to that evidence at trial on relevance grounds, but that objection was overruled and the Court admitted the convictions. In considering a post-trial hearsay challenge to the evidence, the Court found that only a co-conspirator's felony conviction (the defendant's conviction was a misdemeanor) was properly admitted under Rule 803(22), which specifically addresses only felony convictions. In so finding, the Court ruled that Rule 803(22) provided a hearsay exception for the admission of prior felony convictions of a defendant. Id. at *7. (The Court further held, however, that the hearsay objection not made at trial had been waived. Id.). See e.g., United States v. Bailey, 319 F. 3d 514 (D.C. Cir. 2003) ("But convictions come into evidence all the time – thanks to the Rules' explicit provision of a hearsay exception, Federal Rule of Evidence 803(22)"). These cases support the admission of defendants' prior convictions. As in Burrell and Ida, the Government seeks to admit the prior guilty plea and convictions, not as impeachment or other crimes evidence, but to show their participation in the very crime at issue here, the conspiracy. For these purposes, the evidence is

clearly admissible.

Furthermore, the evidence of the defendants' previous plea agreements and admissions during plea colloquies are admissible on a separate, independent ground – as admissions of a party-opponent under Federal Rule of Evidence 801(d)(2). Where the government has an authenticated admission by a defendant, whether signed or under oath, of certain conduct that is relevant to the charged conspiracy, that admission is not hearsay, and must be admitted under Rule 801(d)(2). The Government has provided and will continue to provide to counsel copies of the defendants' previous plea transcripts in this case that we intend to introduce as evidence of the charged conspiracy at trial.

Finally, and in the alternative, evidence of criminal conduct at issue here that occurred outside the scope of the indictment, that is, before 1995, is subject to a Rule 404(b) analysis. Evidence that James Becton, Willie Best, and others engaged in narcotics trafficking and weapons possession is relevant and probative to an issue other than character - in this case, to show intent, knowledge, motive and absence of mistake and to show the background history of the conspiracy. Such evidence is also more probative than prejudicial as the Government must prove a specific intent to distribute. See United States v. Burch, 156 F.3d 1315 (D.C. 1998) (evidence of prior arrest and conviction for attempt possession with the intent to distribute within the very same block was relevant to show knowledge and intent); United States v. Rogers, 918 F.2d 207 (D.C. Cir. 1990) (juvenile plea to distribution was admissible to show that he had not merely picked up someone else's gym bag filled with narcotics "by mistake"); United States v. Crowder, 141 F.3d 1202, 1208 n. 5 (D.C. Cir. 1998) ("A defendant's hands-on experience in the drug trade cannot alone prove that he possessed drugs on any given occasion. But it can show

24

that he knew how to get drugs, what they looked like, where to sell them, and so forth.")

CONCLUSION

For all of the reasons stated above, the evidence noticed herein (and other evidence of the sort noticed herein) is relevant to the charged conspiracy and, in most instances, it is intrinsic to the charges. It should all be admitted in the government's case in chief. At the time of the hearing on this, and in any subsequent filing, the government may note additional grounds for the admission of the above-described evidence.

WHEREFORE the government gives notice of its intent to use intrinsic evidence and Rule 404(b) evidence in its case in chief.

Respectfully submitted,

JEFFREY A. TAYLOR
United States Attorney
D.C. Bar # 498-610

ARVIND K. LAL
Assistant U.S. Attorney
D.C. Bar # 389-489

By:           /s/
MATTHEW P. COHEN
Assistant U.S. Attorney
D.C. Bar # 469-629
Organized Crime and Narcotics Trafficking Section
555 4th Street, N.W., Rm. 4118
Washington, D.C. 20530
(202) 514-7427 office
(202) 514-8707 facsimile