# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Criminal No. 07-131 (JR)** |
| | : | |
| **v.** | : | |
| | : | |
| | : | |
| **JAMES BECTON,** | : | |
| **Defendant.** | : | |

_____

## GOVERNMENT'S OMNIBUS RESPONSE
## TO DEFENDANT JAMES BECTON'S PRETRIAL MOTIONS

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................4

II.     FACTUAL BACKGROUND.................................................................4

III.    MOTIONS RE: DISCOVERY...............................................................8

        A.      J. Becton's Motion for Disclosure of Co-Defendant Statements
                Pursuant to United States v. Bruton (#110)................................8

        B.      J. Becton's Request for Preservation of Electronic Mail (#108)..............9

        C       J. Becton's Request for Notice of Government's Intention to Use
                Rule 404(b) Evidence at Trial (#107)........................................10

        D.      J. Becton's Request for Government Compliance with F.R.C.P.
                16(A)(1)(G)'s Requirements Regarding Notice of Expert
                Testimony and Motion in Limine (#121)....................................10

        E.      J. Becton's Motion to Compel Disclosure of Information
                Regarding Confidential Informants, Witnesses and Cooperating
                Criminals (#116)..............................................................12

        F.      J. Becton's Motion to Compel Disclosure of All Progress Reports
                 Submitted Pursuant to 18 U.S.C. § 2518(6) (#131)...................15

IV.     MOTIONS RE:   SPECIFIC COUNTS, OVERT ACTS,
        AND ALLEGATIONS...........................................................................22

        A.      J. Becton's Motion to Dismiss Various Counts Charging § 843
                Violations for Duplicity (#109)..............................................22

        B.      J. Becton's Request for Bifurcation of Forfeiture Count (#119)..............27

        C.      J. Becton's In Limine Motion Regarding Introduction of
                Evidence Concerning Overt Acts One and Eighteen (#115).....................29

        D.      J. Becton's In Limine Motion Regarding Reference to His
                1993 Narcotics Prosecution (#156)..........................................33

V.      MISCELLANEOUS MOTIONS.............................................................34

        A.      J. Becton's Response to the Government's Notice of

        **Enhanced Penalties (#155)**..............................................................**34**

**B.**    **J. Becton's Motion to Suppress Identification**
        **Testimony (#113)**.....................................................................**40**

**VI.**    **CONCLUSION**.................................................................................**44**

## I.    INTRODUCTION

The United States of America, by and through its attorney, the United States Attorney for

the District of Columbia, hereby submits this Omnibus Response to Defendant James Becton's

Pretrial Motions.[1]  The government believes that this consolidated filing will be the most

efficient and organized means of addressing all of defendant's arguments.


## II.    FACTUAL BACKGROUND

Defendant James Becton and fifteen others were charged, in Count One of a 67-count

Superseding Indictment, with participating in a conspiracy to distribute and possess with intent to

distribute 50 grams or more of crack cocaine, 5 kilograms or more of powder cocaine, and

marijuana, in violation of 21 U.S.C. §§ 841 and 846.  The superseding indictment also charges

the defendants with a host of related offenses, including individual counts of distribution and

possession with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), and unlawful use of a

communication facility, in violation of 21 U.S.C. § 843(b).

The charges in this case stem from a long-term investigation conducted primarily by the

Federal Bureau of Investigation (FBI) and the Metropolitan Police Department (MPD).

Beginning in or about May 2001, the FBI began investigating drug trafficking in and around the

4200 and 4300 blocks of 4th Street, S.E., in Washington, D.C.  This particular stretch of Fourth

Street features a series of apartment parking lots, or "courts", on the west side of the street

beginning south of Chesapeake Street, S.E, with another parking lot, referred to as "the Pit,"

---

[1]  The United States has sought leave of the Court to late-file a separate opposition to
defendant Willie Best's pre-trial motions.

across Fourth Street from the "courts." The Fourth Street "courts" and the "pit" were open air crack cocaine markets. Two brothers, James Lamont Becton and Willie Best, defendants herein, were identified as two of the principal drug sellers operating in this area.

In 2001 and 2002, FBI agents engaged in a series of investigative operations in the Fourth Street area. For example, on July 27, 2001, agents executed a search warrant at 4219 4th Street, S.E., Apartment 7, a known stash location for James Becton. There, agents recovered approximately 67 grams of crack cocaine as well as a ceramic plate and razor blade with crack cocaine residue. And beginning in approximately May 2001 and lasting through 2002, confidential informants working under the direction of FBI agents were able to engage in a series of controlled purchases of drugs from numerous sellers in the Fourth Street area. On seven such occasions, the last of which occurred on June 19, 2002, confidential informants made controlled purchases from James Becton and/or Willie Best. Every one of the controlled purchases from Best and Becton was captured on audiotape.

Although the Fourth Street investigation was progressing and focusing on the principal leaders, James Becton and Willie Best, staffing and resource changes at the FBI had the effect of slowing the pace of law enforcement's work in the area. As the investigation slowed, James Becton, Willie Best, and their co-conspirators strengthened their grip on the 4th Street open-air crack cocaine market. The evidence at trial will show that several factors contributed to the organization's rise and success: the closely confined geographic market that was the 4200/4300 blocks of Fourth Street, S.E., with a lay-out and topography ideally suited for narcotics trafficking; an extensive network of Best-Becton family members and supporters able to assist with drug sales and provide safe harbor; plentiful supply of kilogram-quantities of cocaine from

multiple sources; the highly addictive nature of the end product, crack cocaine;  ready access to

firearms; and a demonstrated willingness on behalf of the organization's members, particularly

James Becton, to protect the organization's "turf" through violence and threat of violence.

The FBI's investigation resumed in earnest in 2004.  That year, while James Becton was

serving an approximately two-year prison sentence, business flourished for Willie Best.  On

January 14, 2004, U.S. Park Police recovered over 50 grams of crack cocaine and over $2000 in

cash from a car that Willie Best and Deborah Jones had parked at the FDR Memorial in

Washington, D.C.  On October 14, 2004, the North Carolina State Highway Patrol recovered four

kilograms of cocaine stashed in a car being driven by one of Best's couriers, which was riding on

Interstate 95 in tandem with a second vehicle in which Best and Jones were traveling.  Police

recovered papers bearing Willie Best's name from the same car as the four kilograms of cocaine.

Beginning on September 27, 2005, following Becton's release from prison and on the

heels of the cultivation of several cooperating witnesses, law enforcement initiated the first in a

series of several periods of court-authorized interception on cellular telephones utilized by the

conspiracy's leadership.  Agents first received authorization to wiretap the cellular telephone of

Fred Mercer, a trusted associate of James Becton and Willie Best and a lieutenant in the

organization.   From that wiretap, agents were able to identify a cellular telephone number for

James Becton and obtained authorization to intercept Becton's telephone from October 27, 2005,

to November 25, 2005.  On the final day of interception, November 25, 2005, Becton's phone

went dead.  In an effort to continue the investigation and develop new numbers for both Becton

and Best, agents obtained court authorization to intercept Mercer's phone for a second thirty-day

period.  The second Fred Mercer wiretap ran from December 16, 2005, to January 14, 2006.

The second wiretap of Fred Mercer's phone yielded a telephone number for Willie Best, and agents conducted two periods of court-authorized interception on Best's phone from January 27, 2006, to February 25, 2006, and from February 26, 2006, to March 27, 2006.  Following the Best wiretaps, agents obtained court-authorization to intercept three additional cellular telephones being utilized by James Becton.  Interception of those three telephone lines began on April 4 and 5, 2006, and ended May 25, 2006.  Collectively, the wiretapped phone calls provided significant evidence of the illegal conspiracy and the organization's day-to-day operations.

Additional evidence about the narcotics conspiracy comes from a series of search warrants executed on May 22, 2006, and a second series of search warrants executed on May 23, 2007, the date of the case "take down."  From these search warrants, agents recovered a number of firearms and a significant quantity of crack cocaine and powder cocaine from the homes of James Becton and Fred Mercer.  In addition, agents recovered numerous items of drug paraphernalia, including several digital scales and other items coated with crack cocaine residue, from persons and locations associated with James Becton, Willie Best, Chris Becton, and Deborah Jones.  From the digital scale found in Deborah Jones's car, the FBI recovered a latent fingerprint that has been identified as Willie Best's.

Collectively, the Government's investigation in this case has marshaled evidence about the historical roots of the Becton-Best drug conspiracy, going back as early as 1992.  The proof at trial will include evidence from fellow co-conspirators who trafficked drugs with or for the defendants; from witnesses and victims of violent offenses perpetrated in furtherance of the conspiracy; from law enforcement officers whose contacts with the defendants over the years provide illustrative proof of the existence of an ongoing narcotics conspiracy; from the wiretaps

on the Mercer, Becton, and Best phones; from the numerous search warrants resulting in the

recovery of narcotics, weapons, cash, drug paraphernalia, and evidence of association between

and among the defendants; and forensic evidence tending to establish guilt.

Trial is scheduled for September 9, 2008.

## III.    MOTIONS RE: DISCOVERY

### A.    J. Becton's Motion for Disclosure of Co-Defendant Statements Pursuant to United States v. Bruton (#110)

Defendant James Becton seeks an order requiring the government to inform the defendant

of all "post-arrest statements made by co-defendants" in this matter.  Because the United States

has already complied with this request as to those defendants who are presently scheduled to go

to trial in September,[2] it appears that defendant's request relates only to the statement(s), if any,

made by other indicted defendants whose cases are <u>not</u> going to trial.  Cast in this light,

defendant's request is little more than a creative effort by defendant James Becton to seek a court

order for early disclosure of <u>Jencks</u> material.  Defendant's motion should be denied.

Defendant Becton's request for <u>Jencks</u> material prior to trial is plainly at odds with the

statute itself, which does not obligate the United States to produce such materials until after

direct examination of the witness.  <u>See</u> 18 U.S.C. § 3500(b) ("After a witness called by the

United States has testified on direct examination, the court shall, on motion of the defendant,

order the United States to produce any statement (as hereinafter defined) of the witness which

relates to the subject matter as to which the witness has testified."); <u>United States v. Tarantino</u>,

846 F.2d 1384, 1414 (D.C. Cir.) (<u>per curiam</u>) ("The Jencks Act directs that in a criminal

---

[2]  The government has given discovery of all post-arrest statements made by the
remaining defendants:  James Becton, Willie Best, Chris Becton, and Deborah Jones.

prosecution, statements made by government witnesses or prospective government witnesses are not open to discovery or inspection by the defense until said witnesses have testified on direct examination in the trial of the case.").  Defendant Becton's request is also at odds with the Rules of Criminal Procedure.  See Fed. R. Crim. P. 26.2(a) (disclosure not required until after the witness has testified on direct examination).

The fact that early disclosure of Jencks material may assist defendant in preparing for trial is no reason to disregard the statute.  See generally Tarantino, 846 F.2d at 1414-1415 (defendant not entitled to early disclosure of Jencks Act statements even when the statements may have assisted in cross-examining other witnesses called by the government earlier in the trial).  The Jencks Act and the Rules authorize the government's disclosure of Jencks material at the time of trial.  See Tarantino, 846 F.2d at 1414 ("This congressional determination is not to be disregarded by the courts."); In re United States, 834 F.2d 283, 287 (2d Cir. 1987) (Jencks Act controls statements by witnesses and district court has "no inherent power to modify or amend the provisions of that Act").  While the government recognizes the need to schedule its Jencks disclosures so as not to delay the trial, our legitimate concerns for witness security counsel against early disclosure in this case.  Instead, we propose disclosing these materials on a rolling basis, beginning approximately one week before trial, which would be sufficient time to afford defendants an opportunity to use the materials for cross examination without delaying the trial.

**B.      J. Becton's Request for Preservation of Electronic Mail (#108)**

Defendant James Becton has moved for an order to require the government to preserve "all electronic mailings that were made in connection with the investigation and prosecution of this case."  Defendant's concern is evidently grounded in the belief that, absent such an order, he

9

will not receive the witness statements he is due under the <u>Jencks</u> Act. Defendant's concerns are misplaced. The United States is aware of and will fully comply with its obligations under the <u>Jencks</u> Act for every witness it calls. We therefore believe that an order from the Court singling out any particular hypothetical category or medium of <u>Jencks</u> material is unnecessary.

> ### C.    J. Becton's Request for Notice of Government's Intention to Use Rule 404(b) Evidence at Trial (#107)

The Government's Notice of Intrinsic Evidence (#136) has put the defense on notice of the nature and breadth of the evidence we intend to introduce to prove the existence of the conspiracy and the defendants' participation in it beyond a reasonable doubt. As set forth in that Notice, the United States posits that all of the evidence, with the exception of certain certified convictions, is direct proof of the conspiracy and thus falls outside of the requirements of Rule 404(b).[3]

> ### D.    J. Becton's Request for Government Compliance with F.R.C.P. 16(A)(1)(G)'s Requirements Regarding Notice of Expert Testimony and Motion in Limine (#121)

Defendant James Becton moves this Court for an order requiring the government to comply with its obligations regarding the disclosure of expert opinion testimony. Defendant's motion seeks notice of any opinion testimony the United States anticipates eliciting from law enforcement agents "under either FRE 701 or 702." Defendant also moves for "significant limitations on the breadth and scope of expert testimony," but defendant's motion is unclear as to

---

[3] In addition to the specific facts set forth in the Notice, the United States has produced a series of search warrant and Title III affidavits to the defense, as well as numerous DEA reports of controlled substance analysis for evidence seized during the course of the investigation. Although we believe it goes without saying, the United States asserts that the evidence summarized in all such materials constitutes direct evidence of the conspiracy and is admissible at trial.

the nature of the limitations he seeks.

With respect to defendant's first request, we reject outright defendant's suggestion that we are obligated to give discovery in the form of expert notice for anticipated lay opinion testimony under Rule 701 of the Federal Rules of Evidence. Nothing in Rule 16(A)(1)(G), cited by defendant, requires advance disclosure of such lay opinion testimony. See United States v. Eiland, 2006 WL 2844921, at *7 & n.14 (D.D.C. Oct. 2, 2006) (Lamberth, J.) ("[T]o the extent that the Government intends to use lay opinion witness testimony under Rule 701, the Government would not be required to disclose to the defendant written summaries of the testimonies of those witnesses to the extent that it would be required to do so under the Federal Rules of Criminal Procedure."). Moreover, Rule 701 is an appropriate vehicle through which the government may present properly-founded opinion testimony regarding the meaning of coded language used by defendant Becton and his co-conspirators in numerous wiretapped phone calls: "In the context of interpretation of recorded conversations, a lay witness with personal knowledge may give opinions as to the meaning of code words used in such conversations." Id. at *3. Consistent with now-Chief Judge Lamberth's opinion in Eiland, which was a multi-defendant narcotics case with substantial wiretap evidence, the FBI agent(s) and cooperating witnesses from whom the government intends to elicit lay opinion testimony regarding the interpretation of certain wiretapped phone calls in this case will have personally listened to each phone call being used at trial and will have formed a subjective interpretation of the meaning of those phone calls. See Eiland, 2006 WL 2844921 at *4. The United States will take special care in its direct examinations of those witnesses to establish that the witnesses' opinions are based on his or her knowledge of the facts surrounding the case at issue, and not based solely on his or her

11

experience or expertise in investigating (or participating in) narcotics trafficking organizations.

<u>See id.</u> at *5.

With respect to defendant's <u>in limine</u> request to limit the "breadth" of testimony, defendant has failed to assert a claim with sufficient specificity such that the government can meaningfully respond. Without a more pointed claim by defendant, the United States is constrained to respond that we of course are aware of our obligations under the Rules of Criminal Procedure and of the limitations that the Federal Rules of Evidence place on the presentation of evidence in any case.[4]

### E.    J. Becton's Motion to Compel Disclosure of Information Regarding Confidential Informants, Witnesses and Cooperating Criminals (#116)

Defendant James Becton moves this Court to order the United States to provide to him the names and identifying information of any informants who have provided incriminating information against him, and who may be called as government witnesses at trial. This motion should be denied.

The government enjoys a qualified, though "time-honored," privilege to withhold the

---

[4] Although it is unclear whether defendant's motion seeks this information, at trial – in addition to testimony about the interpretation of certain wiretapped phone calls – we intend to call a special agent from the FBI who led the investigation in this case to discuss how the FBI conducts large-scale investigations of narcotics trafficking organizations, and how the investigation was conducted in this case. As this testimony will be based on the agent's own experience in conducting such investigations, we do not intend to qualify this witness as an expert.

The United States also intends to call MPD Detective Anthony Washington as a narcotics expert at trial. Detective Washington's testimony will touch on a variety of topics, including the methods for processing, packaging, selling, transferring, trafficking, using and purchasing narcotics in the District of Columbia. We will provide a more detailed notice and listing of Detective Washington's qualifications to defense counsel under separate cover.

identity of its informants from criminal defendants.  Roviaro v. United States, 353 U.S. 53

(1957);  United States v. Brodie, 871 F.2d 125, 128 (D.C. Cir. 1989).  Thus, in making the

determination whether disclosure of a witness' identity to a defendant is necessary, the Court

must balance the public's interest in law enforcement and protecting the informant's identity

against the defendant's right to prepare a defense.  Roviaro, 353 U.S. 53, 62; United States v.

Warren, 42 F.3d 647, 654 (D.C. Cir. 1994).  The defendant bears the heavy burden of proving

that disclosure of the informant's identity is necessary and relevant to the defense.  Warren, 42

F.3d at 654; United States v. Khosravi, 733 F. Supp. 137, 138 (D.D.C. 1990).  More specifically,

the defendant must allege how the informant will help establish his or her innocence; mere

conclusory or speculative pleadings will not suffice.  United States v. Skeen, 449 F.2d. 1066,

1071 (D.C. Cir. 1971).  Here, defendant has failed to make out the required specificity.

The disclosure of the informants' names, to the extent that the defendant does not already

know them, would expose the informants to danger.  The informants' identities are therefore

being withheld for their safety.   Courts will not order disclosure where disclosure will place an

informant in personal danger and the prospective testimony is not exculpatory.  United States v.

Pelton, 578 F.2d 701, 707-08 (8th Cir. 1978).  There is nothing exculpatory about the prospective

testimony of any informant; nor does defendant even allege that any prospective testimony will

be exculpatory.  The government will, of course, supply defense counsel at the appropriate time

with all information, if any, relevant to cross-examination of an informant, consistent with its

obligations under Brady and Giglio.[5]

---

[5]    From defendant's motion, we understand counsel is specifically requesting
information about monies paid and expenditures made on the behalf of particular informants.  As
with any request for information pertaining to benefits that the informants or witnesses have

In addition to classic informant testimony, the government anticipates calling a number of cooperating witnesses at trial. These witnesses will testify about the defendants' criminal activities, <u>not</u> about any particular transactions that they engaged in with defendant Becton while working with the government. With respect to such witnesses, they clearly are not "participants in transactions" within the meaning of <u>Roviaro</u>, and, thus, their identities need not be disclosed. <u>See</u> <u>United States v. Dark</u>, 597 F.2d 1097 (6th. Cir. 1979) (government not required to disclose names of witnesses it intends to call at trial); <u>United States v. Sclamo</u>, 578 F.2d 888 (1st Cir. 1978) (purported need for disclosure generally to enable preparation for cross-examination does not constitute a sufficiently specific showing of materiality and reasonableness).

With respect to the identities of the cooperating informants who <u>did</u> participate in transactions with the defendant, on information and belief, defendant is already aware of their identities. To the extent the defendant is not aware of the identity of those informants, his reliance on <u>Roviaro</u> to secure this disclosure is misplaced. <u>Roviaro</u> arose out of a situation in which the informant who participated in the charged offense was neither made available to the defendant nor testified at trial. In the instant case, if the United States introduces evidence of a particular transaction but does not call the relevant informant to testify at trial, the government will make that informant available to the defendant at his request. <u>See</u> <u>United States v. Foster</u>, 815 F.2d 1200, 1202-03 (8th Cir. 1987) (denial of defendant's motion to disclose informant's identity proper where informant testified at trial and was subject to cross-examination); <u>see also</u>

---

received from the government, the government will, to the extent that the defendant is entitled to this information for impeachment purposes, disclose all information required by <u>Brady</u>, <u>Giglio</u>, and the <u>Jencks</u> Act, so that such information may be used during cross-examination. <u>See also</u> <u>United States v. Phillips</u>, 854 F.2d 273, 276 (7th Cir. 1988).

<u>United States v. Edwards</u>, 47 F.3d 841, 843-44 (7th Cir. 1995) (no disclosure of identity required until immediately before testimony because witness faced substantial danger and defendant was not prejudiced).

    **F.**    **J. Becton's Motion to Compel Disclosure of All Progress Reports Submitted Pursuant to 18 U.S.C. § 2518(6) (#131)[6]**

Defendant moves this Court to compel the government to turn over the periodic or "10-Day Reports" submitted to the supervising judicial officer during the course of court-authorized Title III surveillance. Defendant fails to assert any grounds, factual or legal, which would justify such a disclosure. This motion should be denied.

As an initial matter, defendant concedes in the opening paragraphs of his Motion that he is seeking what he calls "voluntary discovery." (Def.'s Mot. at 1). Defendant could not be more correct. The provisions of the United States Code state that the periodic or "10-Day Reports" to the supervising judge during a Title III wiretap are neither required nor necessary; whether to require such reports in the first instance is left to the discretion of the judge supervising the wiretap. 18 U.S.C. § 2518(6). Thus, "[t]he authorizing statute does not require that such reports be filed, and the judge issuing an order for interception has complete discretion in determining at what intervals he or she wishes the reports submitted." <u>United States v. Orozco</u>, 108 F.R.D. 313, 315, <u>aff'd</u>, 630 F.Supp. 1418, 1438 (S.D. Cal. 1986) (citing 18 U.S.C. 2518(6) and <u>In re DeMonte</u>, 674 F.2d 1169, 1174 (7th Cir. 1982)). And while defendant Becton is correct that the orders governing the interceptions in this case directed the production of periodic reports on a ten-day basis, the statute does not provide for defense access such reports. To the extent

---

[6] Defendant Willie Best has moved to join this motion (#132). We believe our opposition set forth below addresses all the arguments advanced by both defendants.

defendant Becton reads a disclosure obligation (or even suggestion) into the other statutory

provision he cites, 18 U.S.C. § 2518(8)(d), he is simply wrong.   That code provision speaks to

the separate and unrelated inventory notice requirements, in which the United States is required

to notify intercepted parties – after-the-fact – of the existence of the court-authorized

interception.   In that circumstance, and upon request by an intercepted person, the statute gives

the court discretion to make available the intercepted communications themselves, as well as the

applications and orders.  The provision thus applies to an entirely different circumstance then

criminal litigation, and, in any event, the provision does not include the discretionary periodic

reports in its explicit listing of items that may be made available.

Defendant recognizes as much, but he discerns – with no legal authority – a policy

argument in favor of production from the mere fact that the judge who supervised the wiretaps in

this case, in the exercise of her discretion, directed the United States to generate periodic reports.

From that point of departure, defendant suggests – again, with no legal authority – that he needs

to review the periodic reports in order to attack the legality of the wiretaps, to insure that the

United States did not mislead the supervising judge who oversaw the wiretaps, and because such

reports may be given in (voluntary) discovery in some other judicial district.   None of

defendant's arguments support the imposition of a new and sweeping disclosure obligation that

would have the effect of obliterating the United States' work-product privilege in violation of

Rule 16(a)(2) of the Federal Rules of Criminal Procedure.

To begin, defendant Becton has everything he needs to mount a legal challenge to the

wiretaps in this case.  He has every single recorded call, even hang-up calls, in recorded form,

and in written summaries.  Defendant has every line sheet showing, for each call (including hang-

ups and voice mails), all pertinent information, including start and end time, duration, dialed/incoming telephone number, whether the call was answered, and whether the call was minimized. The government has also produced every Title III application, affidavit, and order in this investigation, as well as the government's memoranda setting forth the minimization procedures to be followed during each period of Title III monitoring. Moreover, defendant's review of the wiretap discovery in this case has been substantially facilitated in two additional and novel ways. First, the United States took the extra step in this case of producing all the line sheets to the defense electronically, which allows for each individual defense counsel to search the electronic line sheets by number or other data field. (Defendants therefore do not need to request that the United States run "filters" for their clients; they can do so themselves and thereby generate and rely on work product for their eyes only.) Second, on March 13, 2008, the Court appointed Jensen E. Barber II as a "court expert" whose mandate is to "assist individual defense attorneys in excerpting wiretap conversations or other discovery provided by the government that is deemed particularly relevant to each defendant" (Order Appointing Court Expert, #127). Mr. Barber has been diligently working on behalf of the defendants and their counsel to facilitate their review of the all discovery in this case.

Under these circumstances, there is nothing more that defendant would have by a review of the 10-day reports. Those reports are, for the most part, a summary of information already provided to defendants, i.e., digital recordings of interceptions, summaries and line sheets. Those items, already provided to defendants in full, are the best sources of information regarding statutory compliance. Any defendant could file any motion to challenge the wiretaps based on the documents and items already produced. For example, if defendant Becton wanted to argue

17

that a lack of pertinent calls over time on a particular phone line suggests that the wiretap should

have been brought down before the authorized 30 days was over, the lack of calls would be

reflected in the summaries and recordings and defendant could make the argument.  As a second

example, if the defendant wanted to challenge minimization of calls on the wire, defendant could

easily determine which calls were minimized based on the sheets and recordings already

produced, and compare those to the minimization memoranda he already has.  Defendant does

not need production of the 10-day reports to make such claims (or any others).  And to that end,

with so many documents, recordings, and resources already at his disposal, it is profoundly

telling that defendant Becton has opted to not challenge the legality of the wiretaps in any way

whatsoever.[7]

Defendant Becton does, however, suggest that production of the 10-day reports would

allow him to insure their accuracy.   Even assuming for a moment the reports might contain some

inadvertent <u>inaccuracies</u> (and to our knowledge, they do not), it is difficult to understand how

such a review would reveal improprieties in the wiretap applications and affidavits themselves,

all of which have been produced to defense counsel.  It is those documents which must ultimately

be reviewed in a motion to suppress based on the knowledge of the government agents as of the

date the application was sought.  Under <u>Franks v. Delaware</u>, 438 U.S. 154, 156 (1978), a

defendant is entitled to an evidentiary hearing only if his attack on the affidavit is

"more than conclusory" and accompanied by "allegations of deliberate falsehood or of reckless

---

[7]      Defendant Willie Best has moved to suppress the wiretap evidence (#150), based
largely on alleged deficiencies in the affidavits.  Disposition of defendant Best's motion does not
turn on disclosure of the periodic reports, and defendant Best does not suggest otherwise.  Our
opposition to defendant Best's motion to suppress the wiretap evidence will be filed separately.
<u>See supra</u> n.1.

disregard for the truth."   Defendant has not even attempted to meet this stringent standard, and it

is unclear how disclosure of periodic reports would assist in that regard.

Defendant's motion concedes that his counsel's review of the case law revealed no

decision explicitly ordering the disclosure of periodic reports.   In fact, numerous courts have

found that these reports are not subject to discovery.[8]  For example, in United States v. Wright,

121 F. Supp. 2d 1344, 1350 (D. Kan. 2000), the court specifically rejected a defendant's motion

to compel the production of periodic reports.  "Prepared as a summary of information to assist the

---

[8]       Defendant Becton cited several cases that he claims show that 10-day reports must
be routine discovery elsewhere.  One of those cases, United States v. Orozco, 108 F.R.D. 313
(S.D. Cal. 1985), actually rejects a defense request for discovery of progress reports.  Orozco also
severely undercuts defendant Becton's position that he needs the reports to navigate voluminous
discovery:  that case involved a wiretap investigation covering 47 telephone lines through eleven
court orders.  Id. at 315.  The other cases cited by defendant simply do not address whether the
reports can be reached by Rule 16.  Counsel cites United States v. Vento, 533 F.2d 838 (3d Cir.
1976)), a conspiracy to distribute methamphetamine case in which 10-day reports are not ordered
to be disclosed.  Instead, there is a discussion (id. at 853) in which the Third Circuit briefly notes
that a judge supervising a wiretap may decide that he does not need any reports from the
prosecutor at all, and that the previously disclosed reports were adequate for the defendant's
purposes.  Nowhere in Vento does the court discuss the disclosure of 10-day reports as discovery.
Similarly, in United States v. Ianelli, 477 F.2d 999 (3d Cir. 1973), the Third Circuit considered
an allegation that a judge supervising a wiretap abused his discretion in allowing the wiretap to
continue, based on the "sketchy nature of the progress reports."  The court quickly and bluntly
rejected this argument, stating that "The sufficiency of these reports was a matter for the
supervising judge, and the breadth of his discretion must be viewed in light of the fact that he
could under 18 U.S.C.§ 2518(6) have dispensed with progress reports entirely."  Id. at 1002.  In
United States v. Bennett, 219 F.3d 1117 (9th Cir. 2000), the government had already disclosed its
10-day reports and all discussions in the case are based on that having already occurred.  Id. at
1122.  This is likely because there was an issue in Bennett about proper notification of a possible
victim of a murder for hire plot overheard on the wire that took this case outside the realm of the
ordinary drug wiretap.  Id.  Nothing in the Bennett case stands for the proposition that the
government must disclose its 10-day reports absent a sufficient showing by the defense.   Finally,
in United States v. Ramirez, 602 F. Supp. 783 (S.D.N.Y 1985) it appears that periodic reports
were made available only to the trial court (and not the defense) so that the court could assess a
minimization challenge to the conduct of the wiretap.  See id. at 791.  No such challenge has
been asserted here.

court in judging compliance with its authorization order, progress reports do not provide a

defendant with any original information beyond what can be found in the tapes, transcripts, and

monitor log sheets." Id.; see also Orozco, 108 F.R.D. at 315; United States v. Crozzoli, 698 F.

Supp. 430, 438 (E.D.N.Y. 1988) (in the absence of contention that progress reports not filed, or

not timely filed, or supervising judge abused his discretion with respect to reports, "purely

gratuitous request" for reports would be denied); United States v. Brodson, 390 F. Supp. 774,

777-78 (E.D. Wis. 1975) (because wiretap progress reports represent only summaries of

monitored conversations which are available in full for firsthand examination by defendants, and

because authorizing judge had discretion to dispense with reports entirely, request for discovery

would be denied); United States v. Marchman, 399 F. Supp. 585, 586 (E.D. Tenn. 1975)

(defendant's access to progress reports unnecessary since defendant had access to wiretap

application and order and opportunity to listen to tapes of intercepted communications;

sufficiency of reports is matter for issuing judge). As stated above, in this case, all defendants

have been provided not only with copies of the wiretap applications and orders, and the

minimization memoranda, but with copies of the linesheets, agent summaries, and recordings of

all intercepted conversations. Defendant Becton has articulated no reason why the contents of

progress reports prepared by prosecutors are likely to contain material information beyond what

has already been provided. Nor do the defendants contend a basis – beyond mere supposition

with no grounding in fact – to believe that the material contained in the reports was somehow

inaccurate or misleading.

Defendant Becton also asserts that the practice of disseminating 10-day reports is a matter

of routine in the District of Maryland and perhaps elsewhere. While some other U.S. Attorney's

Offices do share certain 10-day reports, the fact that there may be a different practice elsewhere does not provide the defendant grounds for discovery of the 10-day reports, particularly where, as here, defendant's request for 10-day reports is a mere fishing expedition and an attempt to gain insight into the government's view of what evidence is important in the case.

Although defendant Becton is dismissive of this last point, the government's work product interest in the periodic reports is legitimate and substantial. The periodic reports sought by defendants represent the thoughts and impressions of the investigating agents and Assistant United States Attorneys involved in this matter. To that end, Federal Rule of Criminal Procedure 16 (a)(2) provides, in pertinent part:

> **(2) Information Not Subject to Disclosure.** Except as Rule 16(a)(1) provides otherwise, this rule does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case.

Fed. R. Crim. P. 16(a)(2). The periodic reports are statutorily-required reports prepared by an Assistant United States Attorney and provided to the supervising Court. They include opinions of the prosecutor and a summary of the investigation at that point in time. Thus, the periodic reports are exactly the type of internal government documents not subject to disclosure under Rule 16. See e.g., United States v. Armstrong, 517 U.S. 456, 462-63 (1996) (internal government files not discoverable under Rule 16 when defendant alleged selective prosecution based on race); United States v. Feola, 651 F. Supp. 1068, 1142-43 (S.D.N.Y. 1987); United States v. Nakashian, 635 F. Supp. 761, 775 (S.D.N.Y. 1986), rev'd order on other grounds, 820 F.2d 549 (2d Cir. 1987) (defendant's motion for production of memoranda, logs or notes related to wiretapping, eavesdropping or other surveillance denied because such internal government

documents developed by the prosecution are specifically exempted from discovery).

Periodic reports submitted to a supervising judge during Title III interception may include investigation theories, some of which become prosecution theories. Additionally, these reports contain summaries of conversations of persons who are not parties to this case. Some conversations which the prosecutors deemed pertinent involve persons who are or may be subject to on-going investigation. While the defendants have been provided with copies of the intercepted conversations, we see no reason that they should be allowed to learn of the government prosecutors' thought processes regarding this investigation and other potential investigative targets. That is particularly true where, as here, defendant has already long ago received all of the recorded calls and summaries of the calls themselves, along with all of the supporting documentation, and even has at his disposal a "court expert" to facilitate his review of the discovery already produced.

For all the forgoing reasons, the motion to compel discovery of the periodic or "10-Day Reports" should be denied.

## IV.    MOTIONS RE:  SPECIFIC COUNTS, OVERT ACTS, AND ALLEGATIONS

### A.    J. Becton's Motion to Dismiss Various Counts Charging § 843 Violations for Duplicity (#109)

Defendant Becton has moved to dismiss six counts in the Superseding Indictment charging him with Unlawful Use of a Communication Facility, in violation of 21 U.S.C. § 843(b). Defendant claims these specific offenses violate the rule of duplicity and therefore must be dismissed. Defendant is mistaken.

#### 1.  Background

The superseding indictment includes several charges that the defendants, individually and

in various combinations with each other, unlawfully used telephones to facilitate their conspiracy

to distribute and possess with intent to distribute controlled substances.  As pertains to defendant

Becton, the superseding indictment charges him with 23 such violations.[9]  Though not required,

for each "phone count," the superseding indictment alleges with particularity the specific

telephone number and activation/call number (from the periods of court-authorized Title III

interception) that constitute each charged offense.  Defendant's motion to dismiss alleges that six

of those counts are unlawfully duplicitous because those challenged counts each cite two or more

specific calls as the basis for the offense.

The specific counts that defendant challenges on duplicity grounds are as follows:

- Count 29:   The count alleges four specific calls, activations 1975, 2022, 2040,
  and 2048 for telephone number 757-582-5726.  In this series of calls,
  defendant and a co-conspirator discuss a drug transaction and make plans to
  meet.  In the first call, defendant Becton tells the co-conspirator that the
  "gym" may be open.  Approximately two hours later, Becton calls the co-
  conspirator back and tells him "they say the joint looking right," and confirms
  he is talking about the "gym."  The next two calls are short conversations
  between Becton and the same co-conspirator discussing their whereabouts and
  timing for a face-to-face meeting.

- Count 50:  The count lists two specific calls, activations 759 and 761, for
  telephone number 202-420-8986.  In the first call, defendant Becton is
  speaking to a female when he receives an incoming call from a co-conspirator,
  "Wop," and the two discuss how "Wop" is going to meet Becton to pick up a
  firearm, specifically,  the "joint with the light on it."  Wop tells Becton he is
  on his way.  In the second call, which takes place 20 minutes later, defendant
  Becton calls "Wop" back to determine his whereabouts and time of arrival.

- Count 51:  The count lists two specific calls, activations 1026 and 1194, for
  telephone number 202-420-8986.   In the first call, defendant Becton asks
  Rubin Butler aka "Buster" about money that Butler owes Becton for drug
  sales.  Approximately 8½ hours later, defendant Becton calls Butler and asks

---

[9]  Counts 26, 29, 30, 31, 40, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, and 64.

him where he is.  Becton also asks Butler for "his status," and Butler tells Becton he has "130" [dollars].

- Count 56:  The count lists two specific calls, activations 1726 and 1731, for telephone number 202-292-0713.  These calls are "direct connect" calls in which the phones are used as walkie-talkies.  In the first direct connect, Becton tells co-conspirator Butler that he wants the rest of his money, and Butler tells Becton, "everything I get goes straight to you."  The call is then dropped, and two minutes later, in a second connection, Butler says to Becton, "I owe you three, right?," and Becton corrects him: "325."

- Count 58:  The count lists two specific calls, activations 4010 and 4070 for telephone number 202-420-8986.  In the first call, a co-conspirator tells Becton he needs "four on the smooth tip," just like the last time, and the two discuss the quality of the last batch of cocaine.  In the second call, three hours later, Becton speaks to the same co-conspirator who asks Becton for specific prices relating to the same transaction.

- Count 61: The counts lists two specific calls, activations 4684 and 4708 for telephone number 202-420-8986.  In the first call, Becton speaks to a co-conspirator about how he has not "made a move" yet.  From the call it is clear that Becton and the co-conspirator are awaiting a call from the co-conspirator's source of supply.  In the second call, two hours later, Becton calls the co-conspirator and the co-conspirator tells Becton he still has not heard anything.

Thus, each challenged count cites two or more calls between the same parties, on the same day, regarding the same subject matter.

### 2.  Discussion

"'Duplicity' is the joining in a single count of two or more distinct and separate offenses."  United States v. Klat, 156 F.3d 1258, 1266 (D.C. Cir. 1998).  As defendant concedes, the law is clear that "several acts may be charged in a single count if the acts 'represent a single, continuing scheme that occurred within a short period of time and that involved the same defendant.'"  Id. (quoting United States v. Alsobrook, 620 F.2d 139, 142 (6th Cir. 1980)).  Moreover, courts have held that "[t]he determination of whether a group of acts represents a

single, continuing scheme or a set of separate and distinct offenses is a difficult one that must be left at least initially to the discretion of the prosecution." Alsobrook, 620 F.2d at 142. To that end, at least one reported decision, Cohen v. United States, 378 F.2d 751 (9th Cir. 1967), squarely holds that an indictment that charges a single offense based on a series of phone calls (in Cohen, use of interstate telephone facilities for the transmission of wagers, in violation of 18 U.S.C. § 1084(a)) is not duplicitous, even where each of the individual calls might have been alleged as a separate violation. 378 F.2d at 754.

Furthermore, in assessing a duplicity challenge, the indictment must be measured in terms of whether it exposes the defendant to any of the unfair prejudices associated with duplicity. Those dangers include: (1) inadequate notice of the charges; (2) non-unanimous verdicts; (3) prejudicial evidentiary rulings; and (4) successive prosecution and double jeopardy. See Alsobrook, 620 F.2d at 142. In analyzing these concerns, the Sixth Circuit's decision in Alsobrook, cited by defendant Becton, is instructive. There, the indictment consisted of a single count charging the defendant with a violation of traveling in interstate commerce with the intent to carry on unlawful gambling activity. The indictment specifically listed six dates on which the defendant allegedly traveled interstate as part of the offense, and the defendant claimed that the inclusion of more than one act of travel in support of the charge rendered the indictment duplicitous. The Sixth Circuit noted that each act of interstate travel could have constituted a separate punishable offense, but that the prosecution "elected to characterize the actions ... as a continuing course of conduct that represented only a single offense." The court deemed this characterization a fair one, and emphasized that none of the dangers of duplicity were present:

> The government's theory of prosecution was sufficiently clear to
> provide adequate notice of the charges against Alsobrook and to

> preclude any potential for double jeopardy. The indictment did not
> create any evidentiary problems as a result of the single count.
> Finally, the district court, by instructing the jury that it must reach a
> unanimous decision on at least one act of interstate travel, obviated
> any possibility of a conviction based on a less than unanimous
> verdict.

Id. at 143.

Like the indictments in Cohen and Alsobrook, the challenged counts in the Superseding

Indictment in this case allege, in essence, a continuing course of a conduct as a single offense for

each count. Although each of the six counts listed above cites two or more specific calls, in each

instance the calls are related to one another and are conversations between the same persons,

regarding the same subject matter, on the same day, and within a relatively short time period.

While the government certainly could have exercised its discretion to charge separate offenses in

such an instance, defendant Becton has not been prejudiced in the slightest by the decision to

group related calls together in single counts. To be more specific, defendant has notice of the

charges and the evidence; there is no risk of successive prosecution; there are no evidentiary

problems; and any lingering unanimity concerns can be addressed, as in Alsobrook, with an

instruction to the jury. 620 F.2d at 143.

Moreover, treating the series of related calls as single counts – as in the Superseding

Indictment – makes sense. First, the practice inures to defendant Becton's benefit, because it

spares defendant additional, separate counts with the possibility of cumulative punishments. See

id.; see also Cohen, 378 F.2d at 754 ("The government is to be commended rather than criticized

for treating all such calls for the same purpose during a brief period as one crime subject to a

single statutory penalty."). Indeed, our own Court of Appeals has recognized the danger of

adopting an inflexible duplicity rule that would force the government to charge each punishable

26

act as a separate offense.  See, e.g., Klat, 156 F.3d at 1266; United States v. Mangieri, 694 F.2d

1270, 1282 (D.C. Cir. 1982).  Furthermore, the nature of modern telephone usage is such that

single conversations are often broken into two or more separate calls.  The charging convention

employed in this case will serve to minimize jury confusion that might otherwise arise were there

a series of charges, each relating to different calls on the same date between the same parties

concerning the same subject.

For all these reasons, defendant Becton's motion to dismiss for duplicity should be

denied.

### B.  J. Becton's Request for Bifurcation of Forfeiture Count (#119)

Defendant James Becton has moved to bifurcate the forfeiture allegation from the

remaining counts at trial.  Becton claims that "forfeiture issues ... may well raise issues that fall

outside of the issues concerning the 67 indicted counts."  Defendant is mistaken and his motion

should be denied.

In the course of trying the other counts of the Superseding Indictment, the United States

will introduce substantial evidence regarding the quantity of narcotics sold by defendant and his

co-conspirators, and the pricing structure attendant to the narcotics trafficking.  The jury will

therefore hear explicit testimony about the defendants' proceeds from the sale of powder and

crack cocaine.  Furthermore, evidence regarding defendant Becton's finances will be admissible

to prove the drug trafficking offenses:

> It is well settled that in narcotics prosecutions, a defendant's
> possession and expenditure of large sums of money, as well as his
> or her failure to file tax returns, are relevant to establish that the
> defendant lacked a legitimate source of income and that, in all
> probability, the reason for the failure to report his income is due to
> the defendant's participation in illegal activities.

27

United States v. Briscoe, 896 F.2d 1476, 1500 (7th Cir. 1990) (admitting pursuant to Fed. R.

Evid. 404(b), evidence that defendant had large expenditures but did not pay taxes during years

of conspiracy); see also United States v. Childress, 58 F.3d 693, 713 (D.C. Cir. 1995) (evidence

of unexplained wealth partially established guilt for narcotics conspiracy); United States v.

Edmond, 52 F.3d 1080, 1112 (D.C. Cir. 1995) (unexplained wealth one component of

"substantial proof" of involvement in narcotics conspiracy).  In this case, evidence of defendant

Becton's unexplained wealth will include testimony about his finances and assets, including his

BMW sedan, his flat-screen televisions, his designer clothing, and the large amounts of U.S.

Currency that he always spent at clubs and kept on hand (including those sums seized from him

by law enforcement over the years).  In light of this mutual admissibility, there is no reason to

bifurcate the counts:  "Joined offenses need not be severed . . . if the evidence of each crime

would be admissible in a separate trial for the other."  United States v. Moore, 97 F.3d 561, 564

(D.C. Cir. 1996).

Nor has defendant shown any prejudice that would arise from trial of the entire

indictment together.  By analogy, defendants bear the burden of proving prejudicial joinder under

Fed. R. Crim. P. 14.  Rule 14 countenances some prejudice to a defendant from a joint trial, and

severance is not required simply because a defendant might have a better chance of acquittal if

tried separately.  See United States v. Halliman, 923 F.2d 873, 884 (D.C. Cir. 1991).  Similarly,

speculative allegations regarding the difficulty in adjudicating a forfeiture allegation do not carry

a defendant's burden.  In making a determination on severance, the Court must balance the risk

of prejudice to the defendant against the interest in judicial economy.  United States v. Butler,

822 F.2d 1191, 1194 (D.C. Cir. 1987).  The Court of Appeals has struck a balance in favor of

joint trials, United States v. Leonard, 494 F.2d 955, 965 (D.C. Cir. 1974), and to warrant severance, the risk of prejudice must be compelling. United States v. Cross, 928 F.2d 1030 (11th Cir. 1991). On these facts, defendant cannot carry this burden.

### C. J. Becton's In Limine Motion Regarding Introduction of Evidence Concerning Overt Acts One and Eighteen (#115)

Defendant James Becton moves, in limine, to preclude the introduction of certain evidence pertaining to Overt Acts 1 and 18 in the Superseding Indictment. This motion lacks merit and should be denied.

### 1. Overt Act 1

Defendant first argues that the government should be precluded from introducing testimony that on or about January 13, 1995, officers with the Metropolitan Police Department stopped defendant while he was in the company of co-conspirator and co-defendant Christopher Becton. During this stop, police recovered a pill bottle containing crack cocaine from Christopher Becton, and Christopher Becton ultimately pled guilty to a charge of Possession of Cocaine in D.C. Superior Court case no. 1995 FEL 433. Citing Rule 403 of the Federal Rules of Evidence, defendant James Becton argues that any reference to his presence on the scene of this arrest should be stricken. What defendant fails to acknowledge, however, is that in this case he and Christopher Becton are charged with conspiring with one another and with others to distribute and possess with intent to distribute narcotics, including crack cocaine. Evidence of their association and relationship with each other as early as January 1995 is therefore highly relevant, and, indeed, necessary in order for the United States to prove defendant's guilt beyond a reasonable doubt. Defendant fails to identify any particular prejudice, much less unfair prejudice, that will arise by virtue of the anticipated testimony regarding his presence on the

29

scene.  Accordingly, defendant's motion as to Overt Act 1 should be denied.[10]

### 2.  Overt Act 18

With respect to Overt Act 18, the evidence will show that on or about November 8, 2002, in the 4200 block of Fourth Street, S.E., defendant James Becton opened fire on Russell Harris and his girlfriend, Patricia Perkins.  Defendant fired the shots because of his stated belief that Harris was selling crack cocaine in the "2nd Court" that Harris did not purchase from Becton. Harris received medical treatment for his gunshot wound, but, out of concerns for their safety, neither he nor Perkins initially came forward to identify Becton.  Defendant Becton is correct that, once he was identified as the shooter, he was charged and his case proceeded to trial in D.C. Superior Court, resulting in an acquittal.  Defendant is also correct, however, that the previous acquittal is not a legal impediment to introducing proof of the incident during his federal narcotics conspiracy trial.

Defendant's argument is again based on Rule 403:  Defendant claims that evidence of the shooting will create a danger of unfair prejudice that substantially outweighs its probative value. To bolster that assertion, defendant claims that this episode will be the only proof of violent conduct by defendant during the trial, that the witnesses are not credible, and that proof of the shooting episode will needlessly lengthen the trial.  Defendant's contentions are factually incorrect and unpersuasive.

To begin, as set forth in our Notice of Intrinsic Evidence (#136), the evidence at trial will

---

[10]    We recognize that Christopher Becton's statement to law enforcement following the arrest cannot be introduced against defendant James Becton.  Consistent with <u>Bruton</u> and its progeny, the United States will not seek to introduce the statement against Christopher Becton without first redacting it and clearing the redacted version with the Court and counsel.

establish that James Becton and his brother, Willie Best, engaged in a long-term narcotics conspiracy with each other and the other co-defendants that was centered in the very block where the Harris shooting took place: the 4200 block of Fourth Street, S.E. Contrary to defendant's suggestion that introduction of the November 8, 2002, shooting will inject a violent episode into an otherwise subdued account of peaceful and friendly drug dealing, the evidence at trial will show that one of the main reasons the Becton-Best conspiracy was able to thrive in the 4200/4300 block of Fourth Street, S.E. in the first instance was the willingness of members of the conspiracy to use force and the threat of force to gain and protect market share, and to enforce discipline amongst the conspiracy. To that end, the defense in this case has been put on notice that there will be evidence at trial that defendant James Becton engaged in a variety of violent activity in furtherance of the conspiracy's objectives. (Govt.'s Notice of Intrinsic Evidence at 7-8.) This evidence includes robberies of rival drug dealers, pistol-whipping customers who sought to purchase crack from other sellers, and sicking his pit bull "Rampage" on would-be buyers who sought to spend their money elsewhere. The evidence of violent activity in furtherance of the narcotics conspiracy will not be limited to James Becton. The evidence will show that co-defendants Willie Best and Christopher Becton also engaged in violence to enforce the conspiracy's objectives. (Id. at 9-11.) Accordingly, evidence of the November 8, 2002, shooting will be neither aberrational nor unduly stand out in the eyes of the jury.

Defendant Becton is correct that the specific evidence about the November 8, 2002, will be prejudicial to him, but that is precisely because this episode – perhaps more than any other anecdotal evidence that the United States will present – poignantly shows how defendant Becton was able to exert control over the market for illegal drugs on Fourth Street. The shooting of

31

Russell Harris and Patricia Perkins was directly related to, and in furtherance of, the Becton-Best narcotics conspiracy.  The shooting shows, in stark terms, the lengths to which defendant James Becton would go to enforce discipline and protect the conspiracy's geographic market.  The fact that neither Harris and Perkins reported Becton to the police – a fact that defendant argues counsels against probative value – actually <u>reinforces</u> the fact that James Becton, one of the leaders of the conspiracy, commanded respect and fear in the neighborhood.[11]  In short, proof of the shooting will be highly probative in establishing the existence of a conspiracy, its nature, and defendant Becton's participation in it.

The law in this Circuit is clear that in balancing the probative value of other crimes evidence against the prejudicial effect,[12] "it is a sound rule that the balance should generally be struck in favor of admission when the evidence indicates a close relationship to the offense charged."  <u>United States v. Harrison</u>, 679 F.2d 942, 948 (D.C. Cir. 1982).  Rule 403 "tilts, as do the rules as whole, toward the admission of evidence in close cases."  <u>United States v. Moore</u>, 732 F.2d 983, 989 (D.C. Cir. 1984).  In this case, the risk of <u>unfair</u> prejudice – "an undue tendency to suggest decision on an improper basis,"  <u>Old Chief v. United States</u>, 519 U.S. 172, 187 (1997), is slight.  The jury will receive substantial evidence of defendant's guilt, including wiretapped conversations, law enforcement surveillance, and cooperating witness testimony. The jury also will learn about search warrants conducted at defendant's residences that netted

---

[11]    Patricia Perkins identified defendant Becton as the shooter to police several months later, following Becton's June 17, 2003, unauthorized entry and narcotics arrest in Perkins' apartment in the "2nd Court."  <u>See</u> <u>infra</u> n.14.

[12]    Here, we do not use the phrase "other crimes" in the strict Rule 404(b) sense.  It is the government's position that the November 8, 2002, shooting is not "other crimes" evidence at all, but rather, intrinsic proof of and an overt act in furtherance of the charged conspiracy.

substantial amounts of powder cocaine, crack cocaine, firearms, ammunition, and drug paraphernalia.  In comparison, the testimony about the non-fatal shooting on November 8, 2002, will be elicited through brief direct examinations of two witnesses, Russell Harris and Patricia Perkins.  In addition, we anticipate that two other cooperating witnesses will testify about statements defendant Becton later made about the shooting.  The United States, however, intends to call both of these cooperating witnesses to testify about other matters as well and in any event. Consequently, the proof of Overt Act 18 will not prolong the trial in any meaningful way.

Finally, to address any lingering concerns about the shooting incident, the parties and the Court could give the jury a limiting instruction that specifically instructs on the permissible purposes for which the evidence will be offered.  See Moore, 732 F.2d at 990.  Under all these circumstances, the motion in limine should be denied.

### D.  J. Becton's In Limine Motion Regarding Reference to His 1993 Narcotics Prosecution (#156)

Defendant Becton seeks to preclude the introduction of crack cocaine seized from him after he was chased into an apartment in the "2nd Court" by officers of the Metropolitan Police Department on June 17, 2003.[13]  Defendant correctly asserts that he was charged with possession of crack cocaine with the intent to distribute in that case (2003 FEL 3557), and that a Superior Court judge later granted the defense motion to suppress the drug evidence.  Defendant's motion to suppress was granted on the grounds that defendant had a "reasonable expectation of privacy" in the apartment.  However, the Superior Court judge who presided over the suppression hearing issued his ruling (over the government's objection) without first hearing from the apartment's

---

[13]  Although defendant's motion refers to his "1993 narcotics prosecution," we believe he is referring to his June 2003 arrest.

leaseholder.  The leaseholder, who was present at the time of defendant's arrest, would have testified that defendant was not welcome in the dwelling.[14]

Our records show that the government filed a motion to reconsider the suppression ruling and attached to it an affidavit from the leaseholder.  On March 11, 2004, the Superior Court judge held a hearing on the motion to reconsider, and the judge denied the motion.  Unfortunately, the United States' historical case file does not include a transcript of the March 11, 2004, hearing.  Undersigned counsel has ordered a copy of the March 11, 2004, transcript on an expedited basis.  We respectfully request permission from this Court to take no position on defendant's assertion that collateral estoppel should work as a bar to admission of the drug evidence until we have received and reviewed the March 11, 2004, hearing transcript.

## V.     MISCELLANEOUS MOTIONS

### A.  J. Becton's Response to the Government's Notice of Enhanced Penalties (#155)

Defendant James Becton is presently charged with participating in a conspiracy to distribute and possess with intent to distribute 5 kilograms or more of cocaine, 50 grams or more of crack cocaine, and marijuana, in violation of 21 U.S.C. §§ 841(b)(1)(A)  and 846.  The enhanced penalty provisions of Section 841(b)(1)(A) provide, in part, that if any person commits a violation of this section "after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment which may not be less than 20 years

---

[14]   The leaseholder was Patricia Perkins, one of the shooting victims from November 8, 2002.  (See Part IV.C., supra).  It was following defendant's arrest in her apartment that Ms. Perkins came forward and identified defendant as the shooter.  It appears that Ms. Perkins came to court on the first day of the suppression hearing, but then left when she was told by a defense investigator that she did not need to stay.  Ms. Perkins later reported to the United States that she did not return to court because she felt intimidated by the friends and family of the defendant she saw in the courtroom.

and not more than life imprisonment ... ."  Pursuant to 21 U.S.C. § 851, the United States filed an

Information as to Prior Convictions (#139) to trigger the enhanced penalty provision set forth

above.  Defendant has filed an objection to the Information, claiming that his previous conviction

was "set aside" under the D.C. Youth Rehabilitation Act, and, therefore, does not qualify as a

predicate conviction for enhancement purposes.   As set forth below, defendant's objection to the

Information should be overruled and defendant should be subject to the enhanced penalty

provision.

### 1. Background Regarding Defendant's Prior Conviction for a Felony Drug Offense

On April 25, 1992, officers with the Metropolitan Police Department arrested defendant

Becton and recovered approximately 25 rocks of crack cocaine from his person and vicinity.

Defendant, who was eighteen years old at the time, was charged as an adult with Possession with

Intent to Distribute in D.C. Superior Court case no. 1992 FEL 3580.  Defendant entered a guilty

plea to a lesser-included felony offense, Attempted Possession with Intent to Distribute Cocaine.

According to Superior Court records, on November 12, 1992, defendant was convicted of this

charge and, on April 12, 1993, defendant was sentenced to a period of probation pursuant to the

Youth Rehabilitation Act of 1985.  On November 14, 1994, a D.C. Superior Court judge issued

an order finding that defendant had completed the conditions of his sentence before the

expiration of the maximum period imposed by the court.  The judge ordered that defendant's

conviction be "set aside" pursuant to the Youth Rehabilitation Act.  (A copy of the Order of

Discharge and Certificate Setting Aside Conviction is attached hereto).

### 2. Discussion

The issue presented by defendant's objection is whether his previous conviction in 1992

FEL 3580, which we recognize was "set aside" pursuant to the provisions of the District's Youth

Rehabilitation Act (now recodified at D.C. Code § 24-901 et seq.) (the "YRA"), qualifies as a

"prior conviction" under 21 U.S.C. § 841(b)(1)(A).   It does.

    We note, at the outset, that the certified record from the Clerk of D.C. Superior Court

says as much.  The D.C. Superior Court judge's findings explicitly state, in a single declarative

sentence, that  "The defendant was convicted of Attempted Possession with Intent to Distribute

Cocaine on 11-12, 1992."  (Emphasis added).   As a matter of both historical fact and plain

language, then, defendant received a "conviction" for a prior felony drug offense.

    Furthermore, even though defendant's conviction was  "set aside" some two years later

pursuant to the YRA, a record of the conviction still exists.  In other words, although "set aside,"

defendant's previous conviction was not permanently expunged.  There is a difference.  As our

Court of Appeals has explained, the District's YRA provides a mechanism for Superior Court

judges to "set aside" youthful convictions, "not because of legal error or the juvenile's

innocence," but because the offender's post-offense conduct has persuaded the court to terminate

his sentence of probation before the assigned completion date.  United States v. McDonald, 991

F.2d 866, 872 (D.C. Cir. 1993).  That distinction proved determinative in McDonald, where the

D.C. Circuit held that a conviction "set aside" under the YRA nevertheless counted as a prior

conviction for purposes of a defendant's criminal history calculation under the U.S. Sentencing

Guidelines.  In reaching that conclusion – under circumstances highly analogous to those

presented here – the D.C. Circuit relied heavily on the policy it discerned from both the YRA and

D.C. Court of Appeals caselaw interpreting it:

> Setting aside a conviction may allow a youth who has slipped to
> regain his footing by relieving him of the social and economic

disabilities associated with a criminal record. <u>But if a juvenile turns into a recidivist, the case for conferring the benefit dissipates. Society's stronger interest is in punishing an unrepentant criminal</u>. The <u>Barnes</u> court [<u>Barnes v. United States</u>, 529 A.2d 284, 286-89 (D.C. 1987)] therefore held that the set aside provision did not require "obliteration of the record of conviction" and concluded that "a conviction set aside pursuant to ... the FYCA may, without violating due process, be considered by the court when sentencing a defendant for a subsequent offense."

<u>Id.</u> at 872. (emphasis added and citations omitted). Those very policy considerations dovetail with the obvious legislative policy judgment embodied in 21 U.S.C. § 841's enhancement provisions: to punish and deter recidivism. Defendant's 1992 conviction is therefore as much a "conviction" for purposes of 21 U.S.C. § 841(b)(1)(A) as it will be, under <u>McDonald</u>, for purposes of calculating defendant's criminal history category in the U.S. Sentencing Guidelines should he be convicted in this case.

That conclusion makes good sense. Since being afforded the privilege of a YRA sentence, it can hardly be said that defendant Becton has stayed on the "straight and narrow." To the contrary, defendant has continued to commit crime. He has incurred numerous arrests (including multiple arrests for separate murders and an arrest for assault with a dangerous weapon), and two separate felony convictions in D.C. Superior Court, one for Carrying a Pistol Without a License (CPWL) in case no. 1995 FEL 973 and another for violating the Bail Reform Act in case no. 2003 FEL 3557. Moreover, defendant now finds himself charged in a federal indictment as one of the leaders of a long-term criminal conspiracy responsible for controlling the drug market in the 4200 and 4300 blocks of Fourth Street, S.E., over the course of several years. From a policy perspective, then, there is little to be gained by now affording defendant Becton the benefit of a YRA sentence – an opportunity that he has already elected to squander,

over and over again.   It is therefore not surprising that other federal Courts of Appeals, faced

with similar challenges to the application of the enhanced penalty provisions of 21 U.S.C. §

841(b)(1)(A), have held that prior convictions adjudicated under state youthful offender statutes

similar to the YRA qualify as "convictions" that trigger 21 U.S.C. § 841's enhanced mandatory-

minimum penalties.  See, e.g., United States v. Jackson, 504 F.3d 250, 253 (2d Cir. 2007)

(holding that a prior conviction that was replaced by a "youthful offender finding" under New

York law qualifies as a basis for sentencing enhancement under § 841(b)(1)(B)); United States v.

Acosta, 287 F.3d 1034, (11th Cir. 2002) (same; such "youthful offender and juvenile deferral

statues ... are meant to provide [young, first-time offenders] a second chance, not a technical

legal advantage if, not having learned a lesson, they continue their criminal conduct") (internal

quotations omitted).

   Another determinative factor in whether a previous adjudication constitutes a

"conviction" for purposes of 21 U.S.C. § 841 is the nature of, and procedural protections

afforded during, the previous proceeding.   Courts have distinguished, on the one hand, between

cases in which the earlier adjudication was a finding of juvenile delinquency, in family court,

during which the defendant was not given the right to a jury trial, with, on the other hand, adult

criminal convictions that were afforded first-time offender treatment following conviction.

While the former may not always qualify as a prior "conviction" under § 841, the latter do.  See,

e.g., United States v. Huggins, 467 F.3d 359, 362 (3d Cir. 2006) (holding that "prior conviction"

as used in 21 U.S.C. § 841's enhancement provisions does not include adjudications of juvenile

delinquency under Pennsylvania law, where under the state law the child is not given the right to

jury trial and does not face the same punishment associated with conviction in adult court;

38

distinguishing <u>Acosta</u>, <u>supra</u>, as a case involving an adult conviction).   Here, defendant Becton's

1992 conviction stemmed from a prosecution instituted when he was 18 years old and during

which he was charged as an adult, in adult criminal court.   Defendant was represented by

counsel.   His conviction in 1992 FEL 3580 was arrived at following adversarial legal

proceedings in which defendant was afforded the full panoply of constitutional protections

available in all adult criminal prosecutions, including the right to trial by jury.   Finally, and

significantly, defendant's conviction was based on a finding of factual guilt which defendant

himself does not dispute.   <u>See McDonald</u>, 991 F.2d at 871.   Under these circumstances,

defendant's 1992 conviction is a prior "conviction" under § 841 and thereby triggers the statute's

enhanced penalty provisions.

    That conclusion is confirmed by recent amendments to the YRA.   In 2001, the YRA was

amended to provide that "A conviction set aside under this section may be used ... In determining

whether a person has committed a second or subsequent offense for purposes of imposing an

enhanced sentence under any provision of law."   D.C. Code § 24-906(f)(1) (2001 ed.).

Accordingly, defendant's objection to the government's Information as to Prior Convictions

should be overruled.[15]

---

[15] Defendant correctly points out that over ten years ago, the United States conceded that his 1992 conviction could not serve to enhance his D.C. Code conviction for CPWL in D.C. Superior Court case no. 1995 FEL 973, a case in which a jury acquitted defendant of murder but convicted him of the firearms offense.  At the time of that concession, however, the YRA had not been amended to make clear that convictions previously "set aside" could be used in determining whether a person committed a second or subsequent offense for purposes of imposing an enhanced sentence.  D.C. Code § 24-906(f)(1).  Furthermore, the issue presented in this case, in U.S. District Court, is different.  The question of whether a conviction "set aside" under the YRA qualifies as "conviction" under 21 U.S.C. § 841(b)(1)(A) is one of <u>federal</u> law, not District of Columbia law.  That issue was not presented, not relevant, and not litigated in D.C. Superior Court.  <u>See, e.g.</u>, <u>Huggins</u>, 467 F.3d at 361 ("[T]he question of what constitutes a 'prior

**B.      J. Becton's Motion to Suppress Identification Testimony (#113)**

Defendant James Becton moves to suppress the anticipated in-court identifications of him by two separate government witnesses who engaged in controlled purchases of narcotics from Becton and his brother, Willie Best, during the course of the investigation.  Defendant argues that the anticipated in-court identifications will be inherently unreliable and therefore must be (preemptively) suppressed.  Defendant's arguments are misplaced.

The anticipated identifications at issue will come from two separate government witnesses, who we refer to in this section as Witness A and Witness B.  In 2001, Witness A was a personal acquaintance of defendant Becton and knew him by name.  While working with the FBI, Witness A wore a body wire with an audio recording device and purchased crack cocaine from Becton on May 11, May 22, and June 5, 2001 (Over Acts 8-10 in the Superseding Indictment).  The audio recordings of these buys – which have been produced in discovery – make clear that Witness A was a close associate of defendant's, knew him by name ("Funk," one of defendant's aliases), and that defendant likewise personally knew Witness A.  Moreover, the audio recordings themselves establish that the source of the narcotics sold to Witness A was none other than defendant Becton:   defendant's distinctive voice on the recordings is the same voice that was intercepted during the periods of court-authorized interception on defendant's phone.  The evidence at trial will conclusively establish that voice as defendant's.  (Following waiver of his *Miranda* rights at the time of his arrest in this case, defendant himself listened to several of the intercepted phone calls and identified his voice for the interviewing agents.)

conviction' under § 841(b)(1)(B) is a matter of federal law ... ."); <u>Acosta</u>, 287 F.3d at 1036 ("[T]he meaning of the word 'conviction' in section 841 is governed by federal, rather than state law.").

Likewise, Witness B knew defendant Becton from the 4th Street area by face and by name. On June 19, 2002, while wearing a body wire with an audio recording device, Witness B purchased a quantity of crack cocaine from Willie Best.  In this transaction, Witness B gave Best $1500.  Witness B then watched as Best walked a short distance to his vehicle, spoke to defendant James Becton (who Witness B identified to law enforcement by name) and then returned and put several ziplocks containing a total of 27.1 grams of crack cocaine in Witness B's jacket pocket.

A constitutional challenge to the admission of identification testimony triggers a two-stage inquiry:  (1) was the identification procedure "unnecessarily suggestive" and conducive to irreparable misidentification, and (2) if so, given the "totality of circumstances," was the resulting identification nonetheless reliable.  Stovall v. Denno, 388 U.S. 293, 302 (1967); Manson v. Brathwaite, 432 U.S. 98, 104 (1977); United States v. Washington, 12 F.3d 1128, 1134 (D.C. Cir. 1994).  In evaluating the second prong, the  reliability of a challenged identification, the court must balance the effect of any "suggestive identification" against the five factors used to evaluate the reliability of a witness' identification:

(1)    the witness' opportunity to view the defendant at the time of the crime;

(2)    the witness' degree of attention;

(3)    the accuracy of the witness' prior description of the suspect;

(4)    the witness' certainty at the time of the identification; and

(5)    the time between the crime and the identification.

Id. at 114-16.  Additionally, when assessing reliability, courts may also consider the weight of other evidence of the defendant's guilt.  E.g., United States v. DiTommaso, 817 F.2d 201, 214

n.17 (2d Cir. 1987); United States v. Bell, 812 F.2d 188, 193 (5th Cir. 1987). If reliability is demonstrated under the totality of the circumstances, the identification testimony is admissible at trial, regardless of the suggestivity concerns.

Defendant's motion to suppress the anticipated in-court identifications of Witness A and B must fail, principally, because neither Witness A nor B participated in an out-of-court identification procedure following the controlled buys summarized above. Although the Supreme Court does not appear to have addressed whether an in-court identification without a prior out-of-court procedure is subject to exclusion on due process grounds, most courts to address the issue have concluded that there is no basis for a due process attack on an in-court identification elicited under such circumstances. See, e.g., United States v. Domina, 784 F.2d 1361, 1369 (9th Cir. 1986) ("The Supreme Court has not extended its exclusionary rule to in-court identification procedures that are suggestive because of the trial setting. ... There is no constitutional entitlement to an in-court line-up or other particular methods of lessening the suggestiveness of in-court identification."); State v. Lewis, 609 S.E.2d 515, 518 (S.C. 2005) ("We conclude, as a majority of courts have, that Neil v. Biggers does not apply to in-court identifications and that the remedy for any alleged suggestiveness of an in-court identification is cross-examination and argument."). And while our research indicates that the D.C. Circuit has not addressed the issue, our neighboring D.C. Court of Appeals has recognized that "the suggestivity inherent in the trial process is both inescapable and, being subject to the ameliorative scrutiny of the court and counsel, less threatening of the due process guarantee. ... [W]ithout more, the mere exposure of the accused to a witness in the suggestive setting of a criminal trial does not amount to the sort of impermissible confrontation with which the due process clause is

concerned."  Middleton v. United States, 401 A.2d 109, 132 (D.C. 1979).

Those principles ought apply here.  Both Witness A and B knew defendant; both were in close proximity to him during the charged transactions; and both identified him by name to the supervising agents immediately after the controlled buys.  Under these circumstances, there was no need for a further identification procedure, such as a line-up, show-up, or photographic array, and neither witness participated in one.  Because there was no out-of-court identification "procedure," defendant has not – and cannot – allege a due process violation.  Defendant's concerns about the supposed inherent suggestivity of in-court identifications by Witness A and B will be more than adequately addressed by the built-in safeguards of his criminal trial, namely, "the ameliorative scrutiny of the court and counsel."  Middleton, 401 A.2d at 132.

Finally, even assuming, arguendo, that Witness A and B's anticipatory in-court identifications will be (a) open to due process attack, and (b) so "impermissibly suggestive" as to lead to a likelihood of irreparable misidentification, their identifications will nevertheless be reliable.   Reliability is the "linchpin in determining the admissibility of identification."  Manson, 431 U.S. at 114.  In this case, both Witness A and B were in close proximity to defendant at the time of the events about which they will testify.  Other evidence will corroborate their inculpatory testimony.  And of greatest significance, neither Witness A nor B were strangers to defendant.  They knew him by name and face, and their identifications will be reliable. Accordingly, defendant's motion to suppress identification testimony should be denied.[16]

---

[16]  Although we believe it unnecessary, the Court can make the reliability determinations regarding Witness A and B at trial, after listening to their direct testimony but before the government elicits the in-court identifications.

## VI.   CONCLUSION

        WHEREFORE, the United States respectfully submits that defendant James Becton's

pretrial motions should be DENIED, and, in the case of defendant's "In Limine Motion

Regarding Reference to His 1993 Narcotics Prosecution," that the Court should grant the United

States leave to not take a position until receipt of the Superior Court transcript referenced above.


        Respectfully submitted,

        JEFFREY A. TAYLOR
        United States Attorney
        D.C. Bar # 498-610

        ARVIND K. LAL
        Assistant U.S. Attorney
        D.C. Bar # 389-489


By:_____/s/_____
        MATTHEW P. COHEN
        Assistant U.S. Attorney
        D.C. Bar # 469-629
        Organized Crime and Narcotics Trafficking Section
        555 4th Street, N.W., Rm. 4118
        Washington, D.C. 20530
        (202) 514-7427 office
        (202) 514-8707 facsimile



# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

## ORDER OF DISCHARGE AND CERTIFICATE SETTING ASIDE CONVICTION

UNITED STATES
DISTRICT OF COLUMBIA

vs.                                             Case No.  __F-3580-92__

__James Becton__                                PDID No. __445-559__

This matter comes before the Court on an application to discharge and set aside the conviction of the above-named defendant. After review of the defendant's file, the Court finds that:

1. The defendant was convicted of __Attempted Possession with Intent to Distribute Cocaine__ on __11-12__, 19__92__.

2. On __4-12__, 19__93__, under the provisions of the Youth Rehabilitation Amendment Act of 1985,

   [XX]  The defendant was placed on probation.

   [  ]  The defendant was committed.

3. The defendant has successfully completed the conditions of his/her sentence prior to the expiration of the maximum period previously imposed by the Court.

Therefore, it is hereby ORDERED that the defendant be unconditionally discharged from the imposed sentence, and

It is FURTHER ORDERED that by this discharge the conviction shall be set aside, and the court shall issue a copy of this Order and Certificate to the defendant, and all appropriate agencies, pursuant to D.C. Code, § 24-803.

_November 14, 1994_
DATE

_[signature]_
JUDGE

A TRUE COPY
TEST: _05/27/08_
Clerk, Superior Court of the
District of Columbia

By _[signature]_
Deputy Clerk

White — Court
Blue — Defendant
Green — Probation Office
Canary — U.S. Attorney/Corporation Counsel
Pink — Metropolitan Police Department
Goldenrod — Director of FBI

FORM SS(4)-1638/Sept. 86                                    87-p6729 wd-229